COOLEY LLP
BENEDICT HUR (SBN: 224018)
(bhur@cooley.com)
MICHAEL ROME (SBN: 272345)
(mrome@cooley.com)
JONATHAN PATCHEN (SBN: 237346)
(jpatchen@cooley.com)
3 Embarcadero Center, 20th Floor
San Francisco, California 94111-4004
Telephone: +1 415 693 2000
Facsimile: +1 415 693 2222

ELIZABETH B. PRELOGAR (SBN: 262026)
(eprelogar@cooley.com)
RAYMOND P. TOLENTINO (*Pro Hac Vice* forthcoming)
(rtolentino@cooley.com)
EPHRAIM A. MCDOWELL (*Pro Hac Vice* forthcoming)
(emcdowell@cooley.com)
1299 Pennsylvania Avenue NW, Suite 700
Washington, District of Columbia 20004-2400
Telephone: +1 202 842 7800
Facsimile: +1 202 842 7899

Attorneys for Plaintiffs
Google LLC and YouTube, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

GOOGLE LLC and YOUTUBE, LLC,

Plaintiffs,

v.

ROB BONTA, in his official capacity as Attorney General of California,

Defendant.

Case No. ____________________

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. Assembly Bill 1709 ("AB 1709" or "the Act") wrests control of what kids watch from their parents and gives it to the State. It is California's latest and most extreme effort to restrict protected editorial judgments and publishing decisions in violation of the U.S. Constitution and federal law because it deems the resulting speech too compelling. AB 1709 outright bans online platforms from providing personalized recommendations to users under 16 or automatically publishing videos to those users through an "autoplay" functionality—*even if their parents consent*. In that way, AB 1709 takes things even further than its predecessor, Senate Bill 976 ("SB 976"), which requires parental consent before minor users can obtain personalized recommendations of content tailored to their individual interests. YouTube uses personalized recommendations to ensure that young users receive content that is not only relevant to their interests but also valuable and appropriate given their age and developmental needs. And autoplay helps those users enjoy without interruption content designed to be viewed in sequence, like educational videos that build on one another or music playlists. AB 1709's bans on personalized recommendations and autoplay would therefore frustrate YouTube's efforts to provide under-16 users with safe, responsible, and enriching experiences on the platform.

2. AB 1709's speech bans violate both Section 230 of the Communications Decency Act of 1996 ("Section 230") and the First Amendment of the U.S. Constitution, which provide mutually reinforcing protections of publishers' editorial discretion. Section 230 preempts California's attempt to prohibit personalization and autoplay, each of which clearly constitutes "publishing conduct … [u]nder [Ninth Circuit] precedent." *Doe 1 v. Meta Platforms, Inc.* (*Doe 1*), 174 F.4th 1159, 1167-68 (9th Cir. 2026); *In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 830-31 & n.16 (N.D. Cal. 2023) (holding that plaintiffs' defective-design claim against YouTube as to "auto-play" was barred by Section 230 because it "directly target[s] defendants' roles as publishers of third-party content"). And the Constitution does not permit California to force YouTube to alter its "distinctive compilations of expression," overriding YouTube's editorial judgment to recommend personally interesting, diverse, enriching, and age-appropriate content to each user, or to deprive under-16 users of access to those tailored

compilations with no regard for what their parents think or want. *Moody v. NetChoice, LLC*, 603 U.S. 707, 716 (2024). Plaintiffs Google LLC ("Google") and YouTube, LLC (collectively, "YouTube"[1]) therefore bring this action to enjoin Defendant from enforcing AB 1709's bans on personalized feeds and autoplay and the law's reinforcing obligations, codified at Sections 22683(a)(1), 22683(b), and 22684(b)(1) of the California Business and Professions Code.

3. For people of all ages, YouTube serves as the preeminent online platform for viewing, sharing, and connecting with others through video content. With a collection of over 20 billion videos, YouTube provides access to an endless array of videos on virtually every topic imaginable—from how-to videos to math lectures to network broadcasts. Millions of households now watch YouTube as they once watched television. Beginning in March 2026, YouTube has accounted for a higher percentage of television use among U.S. viewers than any other media distributor in the United States. It is also the most frequently used service for listening to podcasts in the United States, and a leading music streaming service. YouTube is a focal point of culture and content in the United States, and the scale and breadth of its offerings allow users of all ages to access a vast array of valuable video content about nearly any topic of interest to them—if they can find it.

4. To help users navigate YouTube's vast library and create an experience that is right for them, YouTube offers carefully curated, personalized recommendations. Those recommendations make it easier for users to navigate the website and its extensive content—but the benefits of personalization extend far beyond easier navigation. The millions of young people who visit YouTube each day come from diverse backgrounds and have a wide range of interests, ranging from art to science to sports to music. Personalization allows individual users to discover educational, inspiring, and enjoyable content on YouTube despite those users' highly varied interests and preferences. Personalization is also a key safety tool, ensuring that young users receive content that is safe and appropriate for their age group. Moreover, personalized recommendations

[1] In this Complaint, the term "YouTube" refers to both entities collectively except where both entities are separately discussed or otherwise indicated. As explained below, Google owns YouTube, LLC, offers the YouTube service to the public, and is the service provider of YouTube under the YouTube Terms of Service. Where this Complaint refers to the YouTube, LLC entity specifically, it does so under the full name, YouTube, LLC.

allow the millions of content creators on YouTube to gain exposure, share their ideas, and connect with their target audiences.

5. YouTube's recommendations reflect data about the user like watch history and expressed preferences through "likes," "dislikes," and the "not interested" option. They also incorporate YouTube's judgments about what kind of content may be appropriate and valuable for that user, consistent with YouTube's values as a company. For children and teens in particular, YouTube's personalized recommendations are imbued with YouTube's judgments, developed in consultation with experts, about the types of content appropriate for minors in different age categories (for example, under-13 users versus older teens). YouTube's recommendation system therefore enables minors to access a diverse range of high-quality content while ensuring their experiences on the site are responsible, age-appropriate, and enriching. And removing personalization would increase the risk that young users are exposed to content that is not appropriate for them.

6. YouTube's autoplay feature works the way television always has—when one program ends, the next begins. If autoplay is on, YouTube selects a related, age-appropriate video and starts it shortly after the current one finishes. A student finishing one chemistry lecture moves on to the next, just as a family watching broadcast television in their living room does not have to reach for the remote before another program plays. Autoplay is off by default for every user under 18, any user can easily turn it on or off, and parents can disable it entirely for children under 13.

7. If AB 1709 takes effect, millions of minor users will lose access to the benefits of YouTube's recommendation system and autoplay feature because the law categorically prohibits platforms like YouTube from providing personalized feeds and autoplay to users under 16, even with parental consent. These categorical prohibitions are unlawful for two reasons.

8. *First*, AB 1709's bans on personalized feeds and autoplay, as well as its related requirement that YouTube delete accounts of under-16 users who are provided with personalized feeds or autoplay, are preempted by federal law. Section 230 of the Communications Decency Act ("CDA") states that no provider of an interactive computer service "shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. §

230(c)(1). It also bars any State from imposing liability "under any State or local law that is inconsistent with" that command. *Id.* § 230(e)(3). Deciding which of the billions of videos uploaded by YouTube's users to present to a particular viewer, and how to present the next one, is the work of a publisher. The Ninth Circuit has held exactly that: "[M]atching users with content is publishing conduct, even when the user has not requested the content." *Doe 1*, 174 F.4th at 1167.

9. *Second*, AB 1709's ban on personalized feeds and its related requirement that YouTube delete accounts of under-16 users who are provided with personalized feeds violate YouTube's and its under-16 users' First Amendment rights. Those provisions burden YouTube's First Amendment right to organize and display the third-party content on its platform in a curated compilation that aligns with YouTube's value-laden objectives, such as promoting novelty and diversity and delivering age-appropriate content to minors in different age groups. And they infringe the right of YouTube's under-16 users to access compilations of content that are best suited to their interests, age group, and developmental needs. Twenty million new videos are uploaded to YouTube *every day*. Without personalized feeds, millions of under-16 users will struggle to find the content that is right for them amongst billions of videos that are geared toward adults or users with different interests. To make matters worse, AB 1709 substitutes the State's judgment for that of parents, prohibiting under-16 users from accessing personalized feeds even when their parents want them to be able to do so. In defending SB 976, the State emphasized that parents retained the ability to override the State's prohibition, and that the law's parental-consent mechanism represented the State's effort to restrict as little speech as possible while achieving its purported interest in protecting minors' mental and physical health. The State cannot now claim that a complete ban on personalized feeds that strips YouTube of editorial control and overrides parents' assessment of what is best for their children is necessary to achieve that same interest.

10. Because AB 1709 violates Section 230 and the First Amendment, this Court should enjoin Defendant from enforcing AB 1709's bans on personalized feeds and autoplay, as well as its account-deletion requirement, against YouTube to stop the constitutional and practical harms that will otherwise be inflicted on YouTube and its millions of under-16 users.

**PARTIES & STANDING**

11. Google[2] is a Delaware limited liability company and a wholly owned subsidiary of Alphabet, Inc., with its principal place of business located in the County of Santa Clara, California. Google owns and operates many products and services, including YouTube.

12. YouTube, LLC is a Delaware limited liability company with its principal place of business located in California. YouTube, LLC is a subsidiary of Google, and Google is the sole member of YouTube, LLC.

13. YouTube is one of many services that Google makes available to the public for free when a user creates a Google Account. In order to sign in to YouTube, a user must have a Google Account. When users sign up for a Google Account, either on their own behalf or to create an account for an individual under the age of thirteen, they agree to both the Google Terms of Service and the Google Privacy Policy.[3] The Google Privacy Policy identifies YouTube as an example of one of Google's apps and sites, and specifically discloses to users that Google "collect[s] information about your activity in our services, which we use to do things like recommend a YouTube video you might like." YouTube is governed by a separate, specific set of terms because of its unique features. The YouTube Terms of Service expressly incorporate the Google Privacy Policy and indicate that Google is the entity providing the YouTube service.[4]

14. Defendant Rob Bonta is the California Attorney General. Defendant is a California resident and is sued in his official capacity. The Act gives the California Attorney General enforcement authority. *See* Cal. Bus. & Prof. Code § 22686(a). Defendant has publicly pursued enforcement against online platforms under other laws, advancing claims related to minors' online welfare. *See, e.g.*, Complaint, *California v. Meta Platforms, Inc.*, No. 4:23-cv-05448 (N.D. Cal. Oct. 24, 2023), Dkt. No. 1.

---

[2] This section of the Complaint refers to Google and YouTube, LLC separately as appropriate to describe their relationship and clarify that both entities have standing.

[3] The current version of the Google Terms of Service can be found at this URL: https://policies.google.com/terms?hl=en-US [https://perma.cc/KF3V-H6LN]. The current version of the Google Privacy Policy can be found at this URL: https://policies.google.com/privacy?hl=en [https://perma.cc/3CNQ-T97H].

[4] The current version of the YouTube Terms of Service can be found at this URL: https://www.youtube.com/static?template=terms [https://perma.cc/D7KF-TRZ2].

15. Google and YouTube, LLC have standing to challenge AB 1709's bans on personalized feeds and autoplay, as well as the related account-deletion requirement. The law imposes obligations on "covered platform[s]," defined as "[a]n internet website, online service, online application, or mobile application, including, but not limited to, a social media platform, … that offers users or provides users with" enumerated features—including personalized feeds and autoplay—"as a significant part of the service provided by that internet website, online service, online application, or mobile application." Cal. Bus. & Prof. Code § 22682(c)(1); *see id.* § 22682(a). The law bars covered platforms from providing personalized feeds or autoplay to any "user who is under 16 years of age," *id.* § 22683(a)(1), and requires covered platforms to "implement reasonable measures to ensure that users under 16 years of age are not provided" with personalized feeds or autoplay, *id.* § 22683(b). The law further requires YouTube to "delete the account of a user under 16 years of age" if that user is provided with a personalized feed or autoplay. *Id.* § 22684(b)(1); *see id.* §§ 22683(a)(2), 22684(b)(2). YouTube is a website and application that provides personalized feeds and autoplay. It therefore has reason to believe that it is a "covered platform" under the Act and would face a serious risk of an enforcement action by Defendant if it does not comply with the Act's restrictions on personalized feeds and autoplay. To comply, YouTube would need to change the way it publishes third-party content on its platform and "take significant and costly compliance measures." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392-93 (1988). That suffices to establish injury in fact. *See id.* That the State has not yet enforced the law against YouTube does not negate its injury. "The State has not suggested that the newly enacted law will not be enforced," and there is "no reason to assume otherwise." *Id.* YouTube therefore has "an actual and well-founded fear that the law will be enforced against" it. *Id.* Indeed, in YouTube's challenge to SB 976, Defendant refused to stay enforcement of the law pending YouTube's appeal of the district court's denial of its preliminary-injunction motion.

16. Google and YouTube, LLC independently have standing due to the chilling effect on their First Amendment rights created by AB 1709's ban on personalized feeds. To avoid the risk of enforcement, YouTube will need to alter its speech by changing its expressive compilations of third-party content. "[I]n the context of First Amendment speech, a threat of enforcement" can

"chill[] the exercise of First Amendment rights." *Flaxman v. Ferguson*, 151 F.4th 1178, 1186 (9th Cir. 2025). This chilling effect is itself sufficient to create a "ripe First Amendment claim." *Id.*; *see Am. Booksellers*, 484 U.S. at 393 (The "harm" "of self-censorship … can be realized even without an actual prosecution.").

17. Google and YouTube, LLC's injuries in the form of compliance costs and loss of First Amendment rights are directly traceable to Section 22683(a)(1)'s prohibition on personalized feeds and autoplay and Section 22683(b)'s and Section 22684(b)(1)'s reinforcing obligations. Further, an injunction prohibiting California from enforcing Sections 22683(a)(1), 22683(b), and 22684(b)(1) against Google and YouTube, LLC will address those injuries.

18. Google and YouTube, LLC also have standing to vindicate the First Amendment right of YouTube's under-16 users to receive personalized compilations of content. As the Court explained in *Virginia v. American Booksellers Association, Inc.*, 484 U.S. 383 (1988), "in the First Amendment context, '[l]itigants are permitted to challenge a statute'" not merely because "their own rights of free expression are violated," but also because "the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Id.* at 392-93 (citation omitted). Accordingly, the Ninth Circuit and other courts in this district have held that online platforms have standing to vindicate their users' First Amendment rights. *See, e.g.*, *In re Grand Jury Subpoena, No. 16-03-217*, 875 F.3d 1179, 1183 n.2 (9th Cir. 2017) (holding that Glassdoor, an online job-posting platform, had standing to assert the rights of its users); *In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868, 878 (N.D. Cal. 2022) ("The Ninth Circuit has … recognized that internet platforms can assert the First Amendment rights of their users."); *see also Google LLC v. Bonta*, No. 5:25-cv-9795, 2026 WL 2260373, at *9 (N.D. Cal. Aug. 5, 2026) (considering YouTube's argument that SB 976 violates its users' First Amendment rights on the merits without questioning standing). The same is true here given "the close relationship between [YouTube] and its users" and the "obstacles" that YouTube's under-16 users would "face in asserting their [own] rights." *In re DMCA*, 608 F. Supp. 3d at 878.

## JURISDICTION & VENUE

19. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a).

This Court has authority to grant legal and equitable relief under 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908), injunctive relief under 28 U.S.C. § 1651, and declaratory relief under 28 U.S.C. § 2201(a).

20. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because Defendant performs his official duties in this District and is therefore considered to reside in this District as a matter of law, and because the injuries giving rise to this action have been and will continue to be suffered by Google and YouTube, LLC in Santa Clara County, California.

21. Assignment to the San Jose Division is proper under Local Civil Rule 3-2(c) and (e) because the injuries giving rise to this action have been and will continue to be suffered by Google and YouTube, LLC in Santa Clara County, California.

## BACKGROUND

### A. Google's YouTube Service

22. YouTube is an online platform that allows users to create, upload, and share videos with others around the world. It is the world's largest online video library, accessible in over 100 countries and 80 languages, with a collection of over 20 billion videos. More than 20 million videos are added to YouTube every day. The vast majority of content on YouTube is created, edited, uploaded, and controlled by third parties.

23. The videos on YouTube cover a diverse range of subjects. Users can access videos explaining concepts as abstract as the building blocks of math and science, or as concrete as how to make home repairs. YouTube's videos can teach users how to throw a baseball, or show them historical World Series broadcasts; they can help users learn to play the guitar, or allow them to view a series of Vivaldi violin concertos. YouTube strives to be a community that fosters self-expression on an array of topics as diverse as its user base, and to nurture a thriving creative and informational ecosystem. YouTube benefits not only viewers but also millions of content creators. Those content creators can share their unique expressive messages with a wide audience while earning revenue and even making a full-time living.

24. Google makes YouTube available to the public as one of its products. A user cannot sign in to YouTube without a Google Account; Google is the service provider of YouTube under

the YouTube Terms of Service, which expressly incorporate the Google Privacy Policy; and YouTube uses information collected by Google in its recommendations.

**B. YouTube's Recommender System and Personalization on YouTube**

25. YouTube does not just passively host videos uploaded by users but instead plays a role in selecting, arranging, and curating the videos presented to users. As explained above, YouTube hosts an enormous volume of user-generated content, encompassing billions of videos. Given this volume, YouTube does not present videos in reverse-chronological order. A great deal of high-quality content relevant to modern users has been on the platform for years, and such an approach would deprive users of the benefit of that content. In addition, chronological feeds surface only the most recent content rather than what is most relevant and valuable for a particular user. And bad actors may be able to take advantage of chronological ordering to spread potentially harmful content to more users. Nor does YouTube organize the videos on its platform by generic popularity, which would show users content they are not interested in or that is inappropriate for them merely because it is "popular" or "trending" with other users. And unlike social-media platforms based on a social graph, YouTube does not depend on "friends" or "connections" to determine what content to show to users. Instead of organizing content by chronology, generic popularity, or a social graph, YouTube presents a customized and curated list of video recommendations to each user.

26. Those recommendations reflect YouTube's judgment on how best to arrange and prioritize videos to ensure that each user can find videos that are relevant, trustworthy, and valuable for that particular user. YouTube implements these editorial decisions primarily through its "Recommender System," which YouTube uses to make personalized content recommendations to its users.

27. YouTube's recommendations are the product of a multi-step process. At the outset, YouTube establishes high-level goals for its Recommender System based on its values as a company. YouTube's overall mission is to give everyone a voice and show them the world. And the core objectives of its Recommender System are to recommend interesting, relevant, and high-quality content for a particular user at a particular moment; to optimize for long-term satisfaction;

and to help create safe, enriching experiences on the platform for users of different ages.

28. YouTube engineers build and train the Recommender System to accomplish its objectives, including by selecting inputs and deciding how to translate those inputs into recommendations. Some inputs relate to individual users, like the user's age, language, location, watch and search history, and videos enjoyed by similar users. Others include user survey responses and preferences expressed through "likes," "dislikes," the "not interested" button, and channel subscriptions. The Recommender System also incorporates YouTube's independent standards about what constitutes appropriate, high-quality, and trustworthy content. As YouTube's publicly available Community Guidelines explain, it does not allow certain harmful, offensive, and/or unlawful material on the platform, such as spam, bullying and harassment, and deceptive content.[5]

29. Not all content that complies with the Community Guidelines is equally worthy of recommendation in YouTube's judgment. YouTube deprioritizes low-quality content, like clickbait or videos with low ratings, and raises the prominence of high-quality content, like videos from trustworthy sources or recent videos on newsworthy topics. YouTube also has specific content-moderation policies for children and teens to ensure that they receive content that is high-quality and appropriate for their specific age groups, in line with YouTube's goal of providing minors with safe and responsible experiences on the platform.

30. YouTube further adjusts its recommendations to advance its priorities as a platform, like promoting novelty and discovery. Showing a user more familiar content similar to what she has viewed in the past tends to deliver more short-term value. But YouTube has determined that exposing users to novel, unfamiliar content could generate greater value in the long term as it allows users to discover more of what they might enjoy on the platform. Therefore, YouTube employees have designed the Recommender System to ensure that its recommendations include novel and diverse content, even when the system predicts that the user would prefer familiar content. Implementing this design choice requires YouTube employees to make subjective judgments like whether physics and math are sufficiently different so that they count as diverse or should be

[5] The current version of YouTube's Community Guidelines can be found at this URL: https://support.google.com/youtube/answer/9288567 [https://perma.cc/5BW5-W2KB].

grouped together as STEM topics.

31. YouTube did not just build the Recommender System and leave it to run without further human involvement. Rather, YouTube engineers continually monitor and refine the system to ensure it is functioning as intended by delivering high-quality recommendations to users consistent with YouTube's own values. That involves ongoing work by hundreds of employees who set metrics for success and evaluate the system against those metrics; test multiple versions of the system to determine which one best furthers YouTube's goals; and adjust the system when it is not producing recommendations consistent with those goals.

32. YouTube provides personalized recommendations not only on a user's homepage but throughout the website. For example, YouTube designed its Search function so that a user who enters a search query receives results that, in addition to being generally high-quality, are personally relevant to that user. And YouTube's autoplay feature, described below, also leverages the Recommender System to help decide which video to play next for a given user.

**C. Autoplay on YouTube**

33. To provide a seamless video-viewing experience akin to consecutive programming of traditional television, radio, and many other video- and music-streaming services, YouTube provides an autoplay feature. When autoplay is on and a user finishes watching a video, a related video will automatically begin playing shortly thereafter—just like the next show on television or the next episode on Netflix or Hulu starts playing without the viewer having to pick up the remote, or the next song on a Spotify playlist starts without the listener having to press play. When autoplay is off and a user finishes watching a video, YouTube does not automatically play another video. YouTube may display recommendations to the user, but the user must affirmatively select another video to play.

34. YouTube does not randomly select the next video to automatically play through its autoplay feature. Rather, it selects a video related to the video that the user just finished watching that will enhance the user's viewing experience. To advance YouTube's objective of providing individually enriching, valuable, and age-appropriate content, YouTube leverages its Recommender System to help determine which video to play next through its autoplay feature.

Autoplay is also designed to work with videos intended to be viewed sequentially, like music playlists or "Courses," which are series of educational videos that build on one another.

35. Autoplay is an optional setting that users can turn on and off using a toggle when watching a video or in their account settings.

**D. YouTube's Parental Controls and Tools for Digital Wellbeing for Minors**

36. YouTube recognizes the importance of safeguarding the privacy, physical safety, mental health, and wellbeing of minors who use its platform. It has therefore adopted a variety of policies and measures to help ensure that minor users have age-appropriate and enriching experiences on the platform.

37. To start, YouTube's Recommender System is central to maintaining a responsible and enriching platform for younger users. YouTube has determined that there are certain categories of content that do not violate its Community Guidelines but that may be inappropriate for minors, such as nudity and sexually suggestive content, violent or graphic content, and vulgar language. Videos falling within those categories are age-gated and not recommended to users under 18.

38. YouTube has also adopted content-moderation standards tailored to minors in different age categories. For teens aged 13-17, for example, YouTube avoids repeatedly recommending content that, while innocuous as a single video, could be problematic if viewed in high quantities, such as content that displays social aggression or idealizes certain body types. Meanwhile, YouTube elevates for that age group content deemed high quality for teens based on principles developed in collaboration with mental-health and digital-wellness experts, such as videos showing how to build skills and navigate common experiences and that include credible, expert-supported conversations about mental health. YouTube has also worked with outside experts to identify high-quality, age-appropriate content specifically for children under 13, such as grade-appropriate educational content and content that encourages children to use their imagination. YouTube prioritizes that content in its recommendations for under-13 users but not for older minors. Correspondingly, it deprioritizes for under-13 users content it deems "low quality" for children—like heavily promotional or commercial content, content that encourages dangerous activities, or content that puts popular children's characters in inappropriate or potentially risky

situations.

39. Because YouTube believes that parents and caregivers play an important role in setting the rules for their family's online experiences, it also offers an assortment of technological tools and features that empower parents to tailor their children's and teens' experiences on YouTube.

40. Users known to be under 13 cannot create accounts on their own. Their parents must do so for them, which involves linking the parent's account to the child's so the parent can supervise and manage the child's activity on YouTube. Parents have the option of providing their child with access to only YouTube Kids or setting up a Supervised Kid Account. YouTube Kids is a standalone app built from the ground up to be a safer and simpler experience for children to learn and explore their interests. It features a carefully curated selection of age-appropriate content. YouTube Kids also provides built-in tools like adjustable privacy settings and a timer that displays a friendly alert and stops the app after a set amount of time.

41. A Supervised Kid Account gives users under 13 access to the standard YouTube platform while still enabling parents to control their children's experience. Parents can choose among age-differentiated content settings, block specific channels, disable the ability to post videos, and set screentime limits. Parents can also review, pause, and clear their child's watch history, modifying the recommendations that their child receives. In addition, YouTube provides "Supervised Teen Accounts," through which parents can view their teen's number of uploads, subscriptions, and comments and receive notifications when their teen uploads a video or starts a livestream. Supervised teens are automatically placed in a content setting matching their age (the "Teen" setting for users 13-15 and "Older teen" setting for users 16-17), which their parents can then adjust.

42. YouTube also offers digital wellbeing tools, which encourage minors to be mindful of their screentime. For all users under 18, YouTube turns off autoplay by default and parents have the option to disable autoplay entirely for supervised users under 13. YouTube also reminds the user to "take a break" after a certain interval and prompts the user to stop watching YouTube and go to bed at a certain time. Parents can control "take a break" and bedtime reminders for both

supervised kids and teens. And on YouTube Shorts, a tab on YouTube that displays shorter videos, parents of both supervised kids and teens can set a daily time limit, ranging from 0 minutes to 2 hours.

**E. Assembly Bill 1709's Bans on Personalized Feeds and Autoplay**

43. In September 2026, California enacted AB 1709, which regulates online platforms that offer so-called "addictive feature[s]." Cal. Bus. & Prof. Code § 22682(c). The Act defines "[a]ddictive feature" to include personalized feeds (pejoratively and erroneously described as "addictive feed[s]") and "[a]utoplay." *Id.* § 22682(a). It defines an "[a]ddictive feed" as "an internet website … in which multiple pieces of media generated or shared by users are … recommended, selected, or prioritized for display to a user based … on information provided by the user, or otherwise associated with the user or the user's device," with narrow exceptions. *Id.* § 22682(b). The Act does not define "autoplay."

44. Section 22683 is the Act's core operative provision: It bans covered platforms from providing personalized feeds or autoplay to users under 16. Section 22683 states that "[a] covered platform shall not provide an addictive feature to a user who is under 16 years of age." *Id.* § 22683(a)(1). And it requires covered platforms to "implement reasonable measures to ensure that users under 16 years of age are not provided any addictive feature on the covered platform." *Id.* § 22683(b).

45. Relatedly, Section 22684 requires covered platforms to "delete the account of a user under 16 years of age and any personal information associated with the user of the account" to the extent that user is provided with a personalized feed or autoplay. *Id.* § 22684(b)(1); *see id.* §§ 22683(a)(2), 22684(b)(2).

46. The Act goes into effect on January 1, 2027, and threatens covered platforms with civil penalties of up to $50,000 "per affected minor." *Id.* § 22686(b); *see* Cal. Const. art. IV, § 8(c).

**F. Senate Bill 976's Restrictions on Personalized Feeds and NetChoice's and YouTube's Challenges**

47. AB 1709 is not California's first attempt to restrict minors' access to personalized feeds. SB 976, enacted in September 2024, bars covered platforms from providing minors with

personalized feeds without parental consent and imposes default settings further limiting minors' access to personalized feeds. Cal. Health & Safety Code §§ 27001(a), 27002(b)(2), 27002(b)(4). Under SB 976, users under 16 can access personalized feeds if their parents consent. But if AB 1709 goes into effect, they will lose access to personalized feeds (and autoplay) altogether.

48. In November 2024, NetChoice—an internet trade association of which Google is a member—sought an injunction against SB 976 on First Amendment grounds. The district court denied a preliminary injunction as to the personalized-feed provisions, reasoning that NetChoice lacked associational standing to raise as-applied challenges to those provisions for its members. *NetChoice v. Bonta*, 761 F. Supp. 3d 1202, 1231 (N.D. Cal. 2024).

49. In September 2025, the Ninth Circuit affirmed the district court's associational-standing holding, explaining that "the unique design of each platform and its algorithm affects whether the algorithm at issue is expressive." *NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1014, 1025 (9th Cir. 2025). The Court observed that "the more an algorithm implements human editorial directions, the more likely it is to be expressive," and that "[a]n algorithm that promotes a platform's own message to users is likely to be protected speech." *Id.* at 1014. So the Court concluded that "more information about members' algorithms and feeds" and "the participation of individual members" were necessary to undertake the "fact intensive" First Amendment analysis. *Id.*

50. In November 2025, YouTube brought an as-applied First Amendment challenge to SB 976's restrictions on personalized feeds and sought a preliminary injunction. Across several rounds of briefing, numerous fact and expert declarations, and a lengthy hearing, YouTube provided extensive evidence regarding the expressive nature of its algorithm and feeds.

51. On August 5, 2026, the district court denied YouTube's preliminary-injunction motion. The court held that YouTube was unlikely to succeed on the merits of its First Amendment claim because YouTube had failed to show "that [its] personalized feeds convey an expressive message or reflect human editorial judgment." *Bonta*, 2026 WL 2260373, at *9. The court acknowledged that by providing personalized feeds, YouTube seeks to convey a message that "the user will likely find the displayed content interesting and enriching." *Id.* at *5. But it reasoned that

because YouTube "rel[ies] on predictive algorithms that incorporate users' past watch history and other data" to "make the determination of what is 'interesting'" to individual users, the resulting feeds do not reflect YouTube's expression. *Id.* The court also rejected YouTube's argument that the personalized-feed provisions burden its minor users' First Amendment rights, reasoning that "minor users remain free to search for specific content." *Id.* at *9.

52. On August 11, 2026, YouTube appealed and moved for an injunction pending appeal in the district court, which the court denied on August 21. On August 24, YouTube moved for an injunction pending appeal in the Ninth Circuit. The Ninth Circuit motions panel ordered that the motion be referred to the merits panel and that the appeal be placed on the next available oral-argument calendar. *See* Order, *Google LLC v. Bonta*, No. 26-5132 (9th Cir. Sep. 17, 2026), Dkt. No. 55.1. That appeal is ongoing.

## CLAIMS

### Count I

### *Ex parte Young* and 42 U.S.C. § 1983

### CDA § 230 Preemption

### (§§ 22683(a)(1), (b); 22684(b)(1))

53. YouTube incorporates all prior paragraphs as though fully set forth herein.

54. Section 230 "protect[s] internet-based publishers of third-party content from liability." *Doe 1 v. Twitter, Inc.*, 148 F.4th 635, 640 (9th Cir. 2025). It provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). And it "explicitly preempts inconsistent state laws," *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 681 (9th Cir. 2019), by providing that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with" its terms, 47 U.S.C. § 230(e)(3).

55. Section 230 protects "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Barnes v. Yahoo!, Inc.*, 570 F.3d

1096, 1100-01 (9th Cir. 2009). Each element is satisfied here.

56. **YouTube provides an "interactive computer service."** As the Ninth Circuit and numerous courts in this district have held, YouTube qualifies as an "interactive computer service." 47 U.S.C. § 230(f)(2); *see, e.g.*, *Gonzalez v. Google LLC*, 2 F.4th 871, 891 (9th Cir. 2021), *vacated and remanded on other grounds*, 598 U.S. 617 (2023) (per curiam); *Lewis v. Google*, 461 F. Supp. 3d 938, 954 (N.D. Cal. 2020).

57. **AB 1709 regulates YouTube as a "publisher."** A law "treat[s]" a website "as" a "publisher" when it regulates the choices that make up publication—what third-party content is presented, to whom, in what order, when, and how. *Barnes*, 570 F.3d at 1105. A duty directed at those "traditional editorial functions" necessarily depends on the entity's "status or conduct as a 'publisher'" and thus implicates Section 230. *Id.* at 1102. AB 1709 seeks to restrict (1) which videos YouTube may show to its users (the personalization ban) and (2) when and how such videos may be shown to its users (the autoplay ban). Both bans flunk the "simple" "test" for whether a statute violates Section 230: They "prohibit publishing conduct" on their face. *In re Apple Inc. App Store Simulated Casino-Style Games Litig.* (*In re Apple App Store II*), 806 F. Supp. 3d 1015, 1030 (N.D. Cal. 2025).

58. The personalization ban imposes liability when YouTube chooses which third-party videos each user sees. AB 1709 prohibits YouTube from "recommend[ing], select[ing], or prioritiz[ing]" videos based on any "information provided by the user, or otherwise associated with the user or the user's device." Cal. Bus. & Prof. Code §§ 22682(b), 22683(a)(1). Whether YouTube is liable or not, then, turns on what content it chooses for its users, and how it chooses that content.

59. Making that choice is what a publisher does. *See Doe 1*, 174 F.4th at 1167 ("[M]atching users with content is publishing conduct."); *accord Force v. Facebook, Inc.*, 934 F.3d 53, 67 (2d Cir. 2019) (websites perform "the functions of publishers" when they "present users with targeted content," even if via "algorithms"). But that is the very thing AB 1709 forbids.

60. The autoplay ban likewise prohibits quintessential publishing conduct. On YouTube, autoplay causes another user-uploaded video to begin playing without a separate request from the viewer. AB 1709 thus interferes with YouTube's ability to publish content how it sees fit:

Under the Act, YouTube must withhold the next video until the user affirmatively requests that it be played.

61. AB 1709's autoplay ban thus targets not only a decision related to publication but the very act of publication itself. Publication does not occur just once, when a video is uploaded to YouTube for the first time—instead, a video is published each and every time it is sent to a user. *See Barnes*, 570 F.3d at 1104 ("[e]very repetition … is a publication in itself"). But the decision whether "to publish" or to "postpone" third-party content is a decision Section 230 protects. *Id.* at 1102 (citation omitted). In this respect, too, AB 1709 attempts to "prohibit publishing conduct" on its face. *In re Apple App Store II*, 806 F. Supp. 3d at 1030; *see also Doe 1*, 174 F.4th at 1167 (holding that the decision to publish content to a user is protected "even when [a] user has not requested the content").

62. Even if the ban were to be viewed only as a rule about how to publish content (as opposed to a rule about whether to publish content at all), it still would fail under Section 230. Since the advent of the written word, publishers have had to decide not only what follows a given work, but whether it should follow immediately, later, or only upon request. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636-37 (1994) (how to sequence others' video programming implicates "editorial discretion"). That is the decision YouTube makes with autoplay. It leverages its Recommender System to keep showing related videos that are relevant, trustworthy, and valuable to the user, with only a short pause in between. Because making that decision is "what a publisher does," *Barnes*, 570 F.3d at 1102, Section 230 protects that conduct.

63. AB 1709 also requires YouTube to "delete the account of a user under 16 years of age" if that user is provided with a personalized feed or autoplay. Cal. Bus. & Prof. Code § 22684(b)(1); *see id.* §§ 22683(a)(2), 22684(b)(2). That requirement likewise interferes with YouTube's ability to match users with content and to publish content in the manner of its choosing. And it further compels YouTube to "exercise editorial discretion" by "terminat[ing] an account" it would prefer to keep. *Shared Partnership v. Meta Platforms, Inc.*, ___ F.4th ___, 2026 WL 3266791, at *5 (9th Cir. Oct. 30, 2026).

64. **AB 1709 applies to "information provided by" third parties.** Finally, AB 1709

regulates YouTube as the publisher "of … information provided by another information content provider." 47 U.S.C. § 230(c)(1). By its terms, the ban on personalized feeds applies only to feeds of media "generated or shared by users." Cal. Bus. & Prof. Code § 22682(b). And on YouTube, autoplay likewise presents videos created and uploaded by third-party users. Because third parties provide the videos YouTube publishes, Section 230's final element is met.

65. AB 1709's bans on personalization and autoplay, and the related account-deletion mandate, will irreparably harm YouTube and its under-16 users. Unless Defendant is enjoined from enforcing those provisions against YouTube, YouTube must either abandon the publishing decisions Section 230 protects and overhaul its service for every California user under 16, or risk civil penalties assessed for each affected minor. YouTube cannot recover the costs of compliance from the State. And because penalties attach separately to each affected minor, YouTube has no realistic option of violating the Act once and raising Section 230 as a defense.

**Count II**

**42 U.S.C. § 1983**

**Violation of the First Amendment, as Incorporated by the Fourteenth Amendment**

**(§§ 22683(a)(1), (b); 22684(b)(1) as applied to YouTube's personalized feeds)**

66. YouTube incorporates all prior paragraphs as though fully set forth herein.

67. Sections 22683(a)(1) and 22683(b) as applied to YouTube's personalized feeds violate the First Amendment because they impose content-based restrictions that burden YouTube's expression and its under-16 users' right to access that expression and fail heightened scrutiny. Likewise, Section 22684(b)(1) as applied to YouTube's personalized feeds violates the First Amendment because it imposes a penalty—mandatory account deletion—based on YouTube's protected expression.

68. **AB 1709's ban on personalized feeds burdens YouTube's and its under-16 users' speech rights.** In *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), the Supreme Court held that curated online feeds are expressive, reaffirming that "[d]eciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own." *Id.* at 731. YouTube has exercised its editorial

judgment to "organiz[e]" and "present[]" third-party content on its platform to individual users based on what they are likely to find relevant, trustworthy, and valuable and what will optimize for their long-term user satisfaction. The First Amendment protects that expressive choice about how to select and present third-party content and the "distinctive compilations of expression"—personalized feeds—that result from it. *Id.* at 716, 740. That remains the case even if a platform uses an algorithm to help implement its editorial decisions. *See id.* at 734-35. Indeed, *Moody* held that the First Amendment protects YouTube's feeds while explicitly recognizing that personalization implemented using algorithms is a defining characteristic of those feeds: The Court explained that "[t]he selection and ranking" of videos on YouTube "is most often based on a user's expressed interests and past activities," and that YouTube "use[s] … algorithms" to produce "individualized list[s] of video recommendations." *Id.*

69. AB 1709 prohibits YouTube from providing personalized feeds to any user under 16 and requires YouTube to implement measures to enforce that prohibition. Cal. Bus. & Prof. Code §§ 22683(a)(1), 22683(b), 22684(b)(1). AB 1709 therefore restricts YouTube's ability to "compil[e] the third-party speech it wants in the way it wants," and to "offer[] the expressive product that most reflects its own views and priorities." *Moody*, 603 U.S. at 718. *Moody* makes clear that California cannot impose such a ban on YouTube's expression without "confront[ing] the First Amendment." *Id.* at 731-32.

70. The Ninth Circuit has also observed that "the more an algorithm implements human editorial directions, the more likely it is to be expressive." *Bonta*, 152 F.4th at 1014. YouTube's algorithm implements a multitude of human editorial judgments at every stage of the recommendation process. Humans at YouTube decide what editorial goals should be built into the system, select and design signals to be used as inputs, establish principles for how to translate those signals into recommendations, set metrics to measure success, and continually monitor, test, and refine the algorithm to ensure outputs reflect YouTube's goals and values.

71. For example, YouTube strives to promote long-term satisfaction over short-term engagement. And YouTube has determined that values like discovery and novelty advance that goal. Therefore, YouTube has designed its algorithm to recommend to users content that is different

from what they have viewed before so they can discover new content and new areas of interest they did not even know they had. That requires YouTube employees to make subjective decisions such as whether topics like physics and math are sufficiently different so that they count as diverse, to handpick training examples that teach the algorithm what qualifies as diverse, and to monitor the system to ensure it is correctly balancing new versus familiar content. In that way, YouTube's algorithm acts as a tool for "implement[ing] human beings' inherently expressive choice" to promote novelty and diversity. *Moody*, 603 U.S. at 746 (Barrett, J., concurring). Of course, YouTube cannot determine what will be novel and diverse to a user without considering what she has viewed before—precisely what AB 1709 prohibits.

72. In addition to restricting YouTube's expressive activity, the Act burdens YouTube's under-16 users' right to access a personalized compilation of speech on YouTube that is specifically designed to be relevant, valuable, and age-appropriate for them. The First Amendment protects not only the right to speak but also "the right to *receive* information and ideas"—a right that is "fundamental to our free society." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (emphasis added). And "[m]inors are entitled to a significant measure of First Amendment protection." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (citation omitted); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 (1975) ("[T]he values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors.").

73. Users under 16 have a First Amendment right to access the curated compilation of content that YouTube has determined is most relevant, valuable, and age-appropriate for them. AB 1709 burdens that right by barring users under 16 from accessing YouTube's personalized feeds.

74. Absent personalized feeds, under-16 users will be deprived of a compilation of videos tailored to their interests, preferences, and developmental needs—preventing them from effectively accessing the valuable content that YouTube provides. YouTube is full of educational and enriching content for minors, from step-by-step instructions on how to solve calculus problems to clips of the latest Broadway plays. But without personalization, much of that content will be buried beneath an endless stream of videos intended for viewers of different ages or with different interests.

75. In the context of SB 976, the State has proposed a chronological feed as an alternative. But given that more than 20 million videos are uploaded to YouTube each day, such a feed would obscure content that is relevant, interesting, and tailored to each individual user. Another alternative that has been proposed is organizing content by its general popularity. But such a system would promote content based solely on *other users'* preferences, thereby overriding any idiosyncratic preferences a particular user has expressed. Moreover, content that is popular or "trending" across users of all ages may be inappropriate, less valuable, or potentially less safe for under-16 users. A system built on "trending" status would be a particularly poor fit for YouTube, which, unlike other social-media platforms, is not based on a social graph. Rather, YouTube is more akin to traditional television or streaming services where users seek video content that fits their interests and preferences—not necessarily what their "friends" or "connections" may be watching.

76. That under-16 users can still manually search for content on YouTube is no answer. AB 1709 bars those minors from accessing YouTube's "larger offering": its curated compilations of third-party speech. *Moody*, 603 U.S. at 738. More fundamentally, personalization on YouTube is designed to help users *discover* content that interests them, which they may not know to search for before being exposed to it through YouTube's personalized recommendations. Therefore, forcing under-16 users to rely on search to filter through mountainous amounts of content on YouTube still meaningfully *burdens* their speech rights. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000) ("distinction between laws burdening and laws banning speech is but a matter of degree").

77. **AB 1709's ban on personalized feeds is a content-based restriction on speech subject to strict scrutiny.** Because YouTube has made "a colorable claim that its First Amendment rights … are threatened with infringement," the burden "shifts to the government to justify the restriction on speech." *Bonta*, 2026 WL 2260373, at *4 (quoting *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022)). AB 1709's ban on personalized feeds is content-based and is therefore subject to strict scrutiny.

78. "Laws that regulate speech based on its content are presumptively unconstitutional

and subject to strict scrutiny." *Bonta*, 152 F.4th at 1015 (citation omitted). AB 1709's ban on personalized feeds is content-based because it restricts speech with a particular kind of "communicative content," *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015): speech that is likely to be interesting, relevant, and valuable to an individual user. *See Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 532, 537 (1980) (holding that a bar on including electric-bill inserts "discussing controversial issues of public policy" was content-based); *Matal v. Tam*, 582 U.S. 218, 231, 243 (2017) (similar for restriction on "disparag[ing]" speech).

79. That YouTube must change the content of its speech to comply with AB 1709 confirms that it is content-based. The Supreme Court has held that a law is content-based where speakers can "'avoid or mitigate' the effects of the [law] by altering their speech." *TikTok Inc. v. Garland*, 604 U.S. 56, 71 (2025) (citation omitted). To "'avoid or mitigate' the effects" of AB 1709, YouTube must change the expressive compilation of videos displayed in its feeds, thereby "altering [its] speech." *Id.*

80. **AB 1709's ban on personalized feeds fails any form of heightened scrutiny.** Because AB 1709 is content-based, it is "presumptively invalid," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992), and can be justified only if it is "narrowly tailored to serve compelling state interests," *Reed*, 576 U.S. at 163. And even content-neutral speech restrictions must advance "governmental interests unrelated to the suppression of free speech" and must "not burden substantially more speech than necessary." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997). AB 1709's outright ban on personalized feeds fails either form of heightened scrutiny.

81. Far from advancing an interest "unrelated to the suppression of free speech," AB 1709's core objective is to suppress protected speech that California regards as "addictive" for minors. AB 1709's legislative findings make clear that the State seeks to reduce the amount of time minors spend accessing speech on social-media platforms by forcing platforms to organize or display that speech in a less interesting way. The law's objective is thus *directly* "[]related to the suppression of free speech"—just like a law requiring libraries to mix books up on shelves so minors cannot find ones that interest them and spend less time reading.

82. Even assuming the State had a valid interest, AB 1709 is not sufficiently tailored to

that interest. A complete ban is the antithesis of narrow tailoring. AB 1709 deprives parents of the ability to decide what kind of online experience is right for their children. And it ignores obvious less restrictive alternatives, like voluntary parental controls at the platform or device level, which advance the State's objective without forcing YouTube to alter its speech or stripping parents of decision-making authority. The State has made no effort to show that those alternatives are ineffectual before resorting to the most restrictive option of a ban. *See McCullen v. Coakley*, 573 U.S. 464, 495 (2014) (The State must "demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interest, not simply that the chosen route is easier."). Indeed, the State has elsewhere affirmatively endorsed the less restrictive alternative of providing minor users with an option for non-personalized feeds. *See* Corrected Answering Br. at 1-2, *Google LLC v. Bonta*, No. 26-5132 (9th Cir. Oct. 27, 2026), Dkt. No. 112.1.

83. AB 1709 is also "vastly overinclusive." *Brown*, 564 U.S. at 804. It prohibits all personalized content, even though recommending videos about mechanical engineering to a teen interested in robotics is in no way an "appropriately targeted evil." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). The law also bans access to personalized recommendations for *all* under-16 users—even though the State's experts have admitted that only a small number suffer from purported "[s]ocial media addiction." Declaration of Dr. Jenny S. Radesky ¶ 50, *Google LLC v. Bonta*, No. 5:25-cv-9795 (N.D. Cal. Feb. 20, 2026), Dkt. No. 47-5. At the same time, AB 1709 is fatally underinclusive because it "single[s] out" certain platforms (like YouTube) while leaving untouched other platforms that deliver video content through personalized feeds (like Netflix and Hulu) without providing any "persuasive reason why." *Brown*, 564 U.S. at 802.

84. Further, under strict scrutiny, the State must "show a direct causal link" between personalized feeds and "harm to minors." *Id.* at 799. And intermediate scrutiny requires the State to "demonstrate that the recited harms are real … and that the regulation will in fact alleviate [those] harms in a direct and material way." *Doe v. Harris*, 772 F.3d 563, 577 (9th Cir. 2014) (citation omitted). The State fails either standard because it cannot show any link between personalization and harm to minors. In defending SB 976, the State produced over 500 pages of expert materials and yet was unable to identify a single peer-reviewed or published study establishing that

personalization causes or is correlated with negative health outcomes in minors. Indeed, the State's only study that specifically considered YouTube found *no link* between personalization on YouTube and harm to minors. The State instead relied on studies purporting to show that social-media use in general, not personalization in particular, is associated with harm to minors. AB 1709's legislative findings likewise refer vaguely to evidence relating to harms associated with social media generally, not personalized feeds specifically. But AB 1709 bans personalization, not access to social media. So the State must establish that personalization in particular harms minors. It cannot do so.

85. Unless declared invalid and enjoined, California Business and Professions Code Sections 22683(a)(1), 22683(b), and 22684(b)(1) will irreparably harm YouTube and its under-16 users, depriving them of their fundamental First Amendment rights and imposing significant, unrecoverable compliance costs on YouTube.

**Count III**

**Equitable Relief**

**(§§ 22683(a)(1), (b); 22684(b)(1))**

86. YouTube incorporates all prior paragraphs as though fully set forth herein.

87. Section 22683(a)(1)'s bans on personalized feeds and autoplay, Section 22683(b)'s requirement that YouTube take measures to implement those bans, and Section 22684(b)(1)'s requirement that YouTube delete accounts of under-16 users that are provided with personalized feeds or autoplay violate federal law and deprive YouTube and its users of enforceable federal rights. Federal courts have the power to enjoin unlawful actions by state officials. *Ex parte Young*, 209 U.S. 123, 155-56 (1908).

88. This Court can and should exercise its equitable power to enter an injunction prohibiting Defendant from enforcing Sections 22683(a)(1), 22683(b), and 22684(b)(1) against YouTube with respect to its personalized feeds and autoplay.

**Count IV**

**Declaratory Judgment**

**(§§ 22683(a)(1), (b); 22684(b)(1))**

89. YouTube incorporates all prior paragraphs as though fully set forth herein.

90. Section 22683(a)(1)'s bans on personalized feeds and autoplay, Section 22683(b)'s requirement that YouTube take measures to implement those bans, and Section 22684(b)(1)'s requirement that YouTube delete accounts of under-16 users that are provided with personalized feeds or autoplay violate federal law and deprive YouTube and its users of enforceable rights.

91. With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

92. This Court can and should exercise its power under the Declaratory Judgment Act to enter a declaration that California Business and Professions Code Sections 22683(a)(1), 22683(b), and 22684(b)(1) are unconstitutional as applied to YouTube's personalized feeds and unlawful as applied to YouTube's personalized feeds and autoplay.

**PRAYER FOR RELIEF**

YouTube requests an order and judgment:

A. Declaring that Section 230 of the CDA preempts Sections 22683(a)(1), 22683(b), and 22684(b)(1) of the California Business and Professions Code as applied to YouTube's personalized feeds and autoplay;

B. Declaring that Sections 22683(a)(1), 22683(b), and 22684(b)(1) of the California Business and Professions Code violate the First Amendment as applied to YouTube's personalized feeds;

C. Preliminarily and then permanently enjoining Defendant and his agents, employees, and all persons acting under their direction or control from taking any action to enforce Sections 22683(a)(1), 22683(b), and 22684(b)(1) of the California Business and Professions Code against Google or YouTube, LLC with respect to YouTube's personalized feeds and autoplay;

D. Entering judgment in favor of Google and YouTube, LLC;

E. Awarding Google and YouTube, LLC their attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against state officials; and

F. Awarding Google and YouTube, LLC such other relief as the Court deems proper and just.

Dated: November 4, 2026

COOLEY LLP

By: */s/ Elizabeth B. Prelogar*
Elizabeth B. Prelogar

Attorney for Plaintiffs Google LLC and YouTube, LLC