COOLEY LLP
BENEDICT HUR (SBN: 224018)
(bhur@cooley.com)
MICHAEL ROME (SBN: 272345)
(mrome@cooley.com)
JONATHAN PATCHEN (SBN: 237346)
(jpatchen@cooley.com)
3 Embarcadero Center, 20th Floor
San Francisco, California 94111-4004
Telephone: +1 415 693 2000
Facsimile: +1 415 693 2222

ELIZABETH B. PRELOGAR (SBN: 262026)
(eprelogar@cooley.com)
RAYMOND P. TOLENTINO (*Pro Hac Vice* pending)
(rtolentino@cooley.com)
EPHRAIM A. MCDOWELL (*Pro Hac Vice* pending)
(emcdowell@cooley.com)
1299 Pennsylvania Avenue NW, Suite 700
Washington, District of Columbia 20004-2400
Telephone: +1 202 842 7800
Facsimile: +1 202 842 7899

Attorneys for Plaintiffs
Google LLC and YouTube, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GOOGLE LLC and YOUTUBE, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>ROB BONTA, in his official capacity as Attorney General of California,<br><br>Defendant. | Case No. 5:26-cv-13204<br><br>**GOOGLE LLC'S AND YOUTUBE, LLC'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date: TBD<br>Hearing Time: TBD<br>Judge: TBD |

## TABLE OF CONTENTS

Page


NOTICE OF MOTION & RELIEF SOUGHT ....... 1
MEMORANDUM OF POINTS AND AUTHORITIES ....... 1
INTRODUCTION ....... 1
STATEMENT OF THE ISSUES ....... 3
BACKGROUND ....... 3
A. Google's YouTube Service ....... 3
B. YouTube's Recommender System and Personalization on YouTube ....... 4
C. Autoplay on YouTube ....... 5
D. YouTube's Parental Controls and Digital Wellbeing Tools for Minors ....... 6
E. AB 1709's Restrictions on YouTube's and Its Users' Speech Rights ....... 8
F. Relevant Procedural History ....... 8
LEGAL STANDARD ....... 9
ARGUMENT ....... 9
I. YOUTUBE IS LIKELY TO SUCCEED ON THE MERITS ....... 9
A. Section 230 Preempts AB 1709's Bans on Personalized Feeds and Autoplay. ....... 9
1. YouTube provides an "interactive computer service" ....... 10
2. AB 1709 regulates YouTube as a "publisher" ....... 10
a. The personalization ban imposes liability when YouTube chooses which third-party videos each user sees ....... 11
b. The autoplay ban imposes liability when YouTube publishes third-party videos ....... 13
c. The account-deletion mandate is predicated solely on publishing activity ....... 14
3. AB 1709 applies to "information provided by" third parties ....... 15
B. AB 1709's Ban on Personalized Feeds Violates the First Amendment ....... 16
1. AB 1709's ban on personalized feeds burdens YouTube's and its minor users' First Amendment rights ....... 16
2. AB 1709's ban on personalized feeds is content-based and must therefore satisfy strict scrutiny ....... 21
3. AB 1709's ban on personalized feeds fails any form of heightened scrutiny ....... 22
II. THE EQUITABLE FACTORS CUT DECISIVELY IN FAVOR OF A PI ....... 24
CONCLUSION ....... 25

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. TikTok, Inc.*,
116 F.4th 180 (3d Cir. 2024) ....................16

*In re Apple Inc. App Store Simulated Casino-Style Games Litig.*,
625 F. Supp. 3d 971 (N.D. Cal. 2022) .................... 12-13, 16

*In re Apple Inc. App Store Simulated Casino-Style Games Litig.*,
806 F. Supp. 3d 1015 (N.D. Cal. 2025) .................... 11-13

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) ....................17

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) .................... *passim*

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ....................2, 23

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
29 F.4th 468 (9th Cir. 2022) ....................16

*Calise v. Meta Platforms, Inc.*,
103 F.4th 732 (9th Cir. 2024) ....................10, 13

*Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of N.Y.*,
447 U.S. 530 (1980) ....................21

*Doe 1 v. Meta Platforms, Inc.*,
174 F.4th 1159 (9th Cir. 2026) .................... *passim*

*Doe 1 v. Twitter, Inc.*,
148 F.4th 635 (9th Cir. 2025) ....................2, 9, 13

*Doe (K.B.) v. Backpage.com, LLC*,
768 F. Supp. 3d 1057 (N.D. Cal. 2025) ....................15

*Doe v. Harris*,
772 F.3d 563 (9th Cir. 2014) .................... 23-24

*Dyroff v. Ultimate Software Grp., Inc.*,
934 F.3d 1093 (9th Cir. 2019) ....................14

*Force v. Facebook, Inc.*,
934 F.3d 53 (2d Cir. 2019) ....................11

*Frisby v. Schultz*,
487 U.S. 474 (1988) ....................23

*Gonzalez v. Google LLC*,
2 F.4th 871 (9th Cir. 2021) ....................10

## TABLE OF AUTHORITIES
(continued)


Page(s)

*Google LLC v. Bonta*,
No. 5:25-cv-9795, 2026 WL 2260373 (N.D. Cal. Aug. 5, 2026) .................................. *passim*

*Grand River Enters. Six Nations, Ltd. v. Knudsen*,
No. 23-35494, 2024 WL 2992503 (9th Cir. June 14, 2024) ....................................................24

*Grosjean v. Am. Press Co.*,
297 U.S. 233 (1936) ....................................................................................................10

*HomeAway.com, Inc. v. City of Santa Monica*,
918 F.3d 676 (9th Cir. 2019) ..........................................................................................9

*Labrador v. Poe*,
144 S. Ct. 921 (2024) ....................................................................................................24

*Lemmon v. Snap, Inc.*,
995 F.3d 1085 (9th Cir. 2021) ........................................................................................12

*Lewis v. Google LLC*,
461 F. Supp. 3d 938 (N.D. Cal. 2020) ...........................................................................10

*Matal v. Tam*,
582 U.S. 218 (2017) ....................................................................................................21

*McCullen v. Coakley*,
573 U.S. 464 (2014) ....................................................................................................22

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974) ................................................................................................ 10-11

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ............................................................................................ *passim*

*NetChoice v. Att'y Gen., Ga.*,
No. 25-12436, 2026 WL 3079563 (11th Cir. Oct. 15, 2026) .................................................13

*NetChoice v. Bonta*,
761 F. Supp. 3d 1232 (N.D. Cal. 2025) .......................................................................3, 25

*NetChoice v. Bonta*,
790 F. Supp. 3d 798 (N.D. Cal. 2025) .......................................................................11, 25

*NetChoice v. Griffin*,
812 F. Supp. 3d 905 (W.D. Ark. 2025) ...........................................................................23

*NetChoice, LLC v. Bonta*,
152 F.4th 1002 (9th Cir. 2025) ................................................................................ 17-19, 24

*Okla. Press Publ'g Co. v. Walling*,
327 U.S. 186 (1946) ....................................................................................................10

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Packingham v. North Carolina*,
582 U.S. 98 (2017)....................25

*Patterson v. Meta Platforms, Inc.*,
244 A.D.3d 29 (N.Y. App. Div. 2025) ....................15

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992)....................21

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)....................21

*Reuber v. Food Chem. News, Inc.*,
925 F.2d 703 (4th Cir. 1991) (en banc) ....................17

*Shared Partnership v. Meta Platforms, Inc.*,
___ F.4th ___, 2026 WL 3266791 (9th Cir. Oct. 30, 2026) ....................14

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*,
702 F. Supp. 3d 809 (N.D. Cal. 2023)....................14

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)....................18

*Stanley v. Georgia*,
394 U.S. 557 (1969)....................20

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
240 F.3d 832 (9th Cir. 2001) ....................25

*TikTok Inc. v. Garland*,
604 U.S. 56 (2025)....................21

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994)....................14

*Turner Broad. Sys., Inc. v. FCC*,
520 U.S. 180 (1997)....................22

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000)....................21

*Valle del Sol Inc. v. Whiting*,
732 F.3d 1006 (9th Cir. 2013) ....................25

*Winter v. NRDC*,
555 U.S. 7 (2008)....................9

## TABLE OF AUTHORITIES
(continued)

**Page(s)**


**Constitutions**

U.S. Const. amend. I .......... *passim*

Cal. Const. art. IV, § 8(c) .......... 8

**Statutes**

47 U.S.C.
§ 230 .......... *passim*
§ 230(c)(1) .......... 2, 9, 15
§ 230(e)(3) .......... 9
§ 230(f)(2) .......... 10
§ 230(f)(4) .......... 10

Cal. Bus. & Prof. Code
§ 22682(a) .......... 8
§ 22682(b) .......... 8, 11-12, 15
§ 22682(c) .......... 8
§ 22683(a)(1) .......... 1, 8, 11
§ 22683(a)(2) .......... 8
§ 22683(b) .......... 1, 8
§ 22684 .......... 8
§ 22684(b)(1) .......... 1, 8, 14
§ 22686(b) .......... 8

Cal. Health & Safety Code
§ 27001(a) .......... 8
§ 27002(b)(2) .......... 8
§ 27002(b)(4) .......... 8

**Other Authorities**

*American Heritage Dictionary* (3d ed. 1992) .......... 10

*Benjamin Franklin's Memoirs* (Max Farrand ed. 1949) .......... 11

## NOTICE OF MOTION & RELIEF SOUGHT

Pursuant to Federal Rule of Civil Procedure 65 and Civil Local Rule 65-2, Plaintiffs Google LLC ("Google") and YouTube, LLC (collectively, "YouTube") will and hereby do move for a Preliminary Injunction prohibiting Defendant Rob Bonta from enforcing California Assembly Bill 1709 (the "Act" or "AB 1709")—specifically, California Business and Professions Code Sections 22683(a)(1), 22683(b), and 22684(b)(1)—against YouTube with respect to YouTube's personalized feeds and autoplay feature. YouTube and its users face immediate and irreparable harm without a preliminary injunction. Absent such relief, the Act will require YouTube to stop providing personalized feeds and autoplay to its under-16 users, thereby imposing liability on YouTube for its publishing activities in contravention of Section 230 of the Communications Decency Act, 47 U.S.C. § 230, and unconstitutionally restricting YouTube's and its users' First Amendment rights.

This motion is based upon the Complaint in this action, this Notice of Motion, the Memorandum of Points and Authorities, the Proposed Preliminary Injunction Order, the Declarations of Cristos Goodrow and Alexandra Veitch, the Expert Declarations of Jeffrey A. Hall, Douglas E. Tucker, Jennifer Pfeifer, and Georgios Zervas, all matters with respect to which this Court may take judicial notice, and such oral and documentary evidence as may be presented to the Court.

Plaintiffs will submit an amended notice of motion setting forth the date and time for hearing, if one is set by the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Every day, tens of millions of young people visit YouTube to learn, connect with others, and explore new interests. Because no human being could navigate billions of user-uploaded videos on her own, YouTube does what publishers have done for centuries—it recommends certain works to certain viewers, and it decides how and when to present those works on its platform.

California Assembly Bill 1709 (AB 1709) prohibits those publishing decisions. It bars YouTube from recommending content to its under-16 users based on their viewing history or interests (the personalization ban) or playing a new video automatically for those users when the current one ends (the autoplay ban). And it sweeps even further than its statutory predecessor, Senate Bill 976

(SB 976), by stripping parents of any say in the matter. Even if a parent wants her 15-year-old daughter who is interested in science and classical music to receive recommendations for chemistry tutorials or to view performances of each concerto within Vivaldi's *Four Seasons* in a seamless sequence, California forbids it. In this way, AB 1709 overrides protected publishing decisions, expression, user autonomy, and parental choice—intrusions that are not permitted under Section 230 of the Communications Decency Act of 1996 (Section 230) or the First Amendment.

This Court should enjoin enforcement of AB 1709 against YouTube because Section 230 expressly preempts it. Section 230 forbids States from treating a website like YouTube "as the publisher" of third-party information. 47 U.S.C. § 230(c)(1). But choosing which video to show a viewer, and deciding when and how to present the next one, is not incidental to publishing—it is what publishers do. *See Doe 1 v. Meta Platforms, Inc.* (*Doe 1*), 174 F.4th 1159, 1167-68 (9th Cir. 2026) (reaffirming that "matching users with content is publishing conduct" immunized by Section 230 "[u]nder [Ninth Circuit] precedent"). And because those decisions are "quintessentially the province of a publisher," *Doe 1 v. Twitter, Inc.* (*Twitter*), 148 F.4th 635, 645-46 (9th Cir. 2025), they are YouTube's to make, free of interference from state law.

The First Amendment forbids AB 1709's personalization ban too. For over a century, states have warned that each form of new media—from films to comic books to video games—is too hypnotic, irresistible, and psychologically overwhelming to be left in the hands of young people. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795-98 (2011). But the Supreme Court has repeatedly rejected the idea that the First Amendment includes "a free-floating power to restrict the ideas to which children may be exposed." *Id.* at 794. YouTube is a forum for those ideas. Under *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), the First Amendment protects YouTube's efforts to curate those ideas—to organize and display content in a way that is personally interesting, relevant, and valuable to its users. *See id.* at 728 ("presenting a curated compilation of speech originally created by others" is expressive activity). And YouTube's under-16 users have a First Amendment right to access YouTube's curated compilations in accordance with their families' choices. California has no legitimate interest in making speech less engaging or in usurping parental authority.

YouTube is therefore likely to succeed on the merits in this litigation. And that means

YouTube has necessarily shown irreparable injury, because YouTube "and the community will suffer great harm from the law's restriction of speech." *NetChoice v. Bonta*, 761 F. Supp. 3d 1232, 1236 (N.D. Cal. 2025). AB 1709 will not only stifle YouTube's expression and fundamentally alter the speech environment on YouTube for millions of users; it will also impose unrecoverable compliance costs on YouTube. This Court should preliminarily enjoin AB 1709 as it applies to YouTube's personalized feeds and autoplay.

## STATEMENT OF THE ISSUES

1. Is YouTube likely to succeed on the merits of its claim that Section 230 preempts AB 1709's bans on personalized feeds and autoplay?
2. Is YouTube likely to succeed on the merits of its claim that AB 1709's ban on personalized feeds infringes its and its under-16 users' First Amendment rights?
3. Do the equitable factors favor enjoining Defendant's enforcement of AB 1709's ban on personalized feeds and autoplay against YouTube?

## BACKGROUND

### A. Google's YouTube Service

YouTube is an "online platform that allows users to view, create, upload, and share videos with others around the world." Declaration of Cristos Goodrow (Goodrow) ¶ 3. It is the world's largest online video library, available in over 100 countries and 80 languages, with a collection of over 20 billion videos. *Id.* ¶¶ 3, 6; Declaration of Alexandra Veitch (Veitch) ¶ 39. And more than 20 million videos are uploaded to YouTube each day. Goodrow ¶ 6. The vast majority of content on YouTube is "created, edited, uploaded, and controlled by third parties." *Id.*

The videos on YouTube cover a diverse array of topics—from "educational videos, how-to videos, high-quality health information, [and] self-improvement videos" to "network broadcasts, science lectures, [and] historical sporting events," among countless other categories. *Id.* ¶ 3. YouTube is also the primary source of television for millions of households, playing a role akin to streaming platforms like Netflix or Hulu. *Id.* ¶ 4. And millions of people rely on YouTube to discover and listen to music and podcasts. *Id.* ¶ 5. YouTube "strives to be a community that fosters self-expression on an array of topics as diverse as its user base, and to nurture a thriving creative and informational

ecosystem." Veitch ¶ 3. It "provides a vibrant platform for millions of content creators." *Id.* ¶ 52. Through YouTube, those creators "share their unique expressive messages" while earning revenue and even making a full-time living. *Id.*

**B. YouTube's Recommender System and Personalization on YouTube**

To connect users with content that will be interesting and appropriate for them and to enable creators to find their target audiences, YouTube plays an active role "in selecting, arranging, and curating the videos presented to users." Goodrow ¶ 6. When a user opens YouTube, she "does not see" the videos posted "in reverse-chronological order." *Moody*, 603 U.S. at 719. Instead, YouTube's Recommender System provides users with "an individualized list of video recommendations." *Id.* at 734. For example, a Golden State Warriors fan might see Steph Curry highlights on her homepage, while a teen interested in robotics might find videos about mechanical engineering. Goodrow ¶ 14. In short, YouTube "arranges and prioritizes videos to ensure that [users] can find videos that are relevant, trustworthy, and valuable to them personally." *Id.* ¶ 6.

YouTube's recommendations are the product of a multi-step process. At the outset, YouTube establishes high-level goals for its Recommender System based on its values as a company. *Id.* ¶ 37. YouTube's "mission [is] to give everyone a voice and show them the world." *Id.* ¶ 7. And its core objectives are to recommend "interesting," "relevant," and "valuable" content for "a particular user at a particular moment," and to "optimize[] for long-term user satisfaction." *Id.* ¶¶ 11, 13, 14.

Next, YouTube engineers build and train the Recommender System to accomplish those objectives, including by selecting inputs and deciding how to translate those inputs into recommendations. *Id.* ¶¶ 41-47. The system is similar to a librarian who "may recommend a book to a visitor based on the prior books that individual has read, books that are popular with similar readers, and the librarian's own views of the quality of the books." *Id.* ¶ 8. Some inputs relate to individual users, like the user's age, language, location, watch and search history, and videos enjoyed by similar users. *Id.* ¶¶ 11, 15, 19-20. Others include user survey responses and preferences expressed through "likes," "dislikes," the "not interested" button, and channel subscriptions. *Id.* ¶ 20. The Recommender System also incorporates YouTube's independent standards about what constitutes appropriate, high-quality, and trustworthy content. As YouTube's Community Guidelines explain, YouTube does not

allow certain harmful, offensive, and/or unlawful material on the platform, like spam, bullying and harassment, and deceptive content. Veitch ¶ 35; *Moody*, 603 U.S. at 735.

But not all content that complies with the Community Guidelines is equally worthy of recommendation in YouTube's judgment. YouTube deprioritizes low-quality content, like clickbait or videos with low ratings, and raises the prominence of high-quality content, like videos from trustworthy sources or recent videos on newsworthy topics. Goodrow ¶¶ 26-32. As described below, YouTube also has specific content-moderation policies for children and teens to ensure they receive content that is high-quality and appropriate for their age groups, in line with YouTube's goal of providing minors with safe and responsible experiences on the platform. *Id.* ¶¶ 17, 29, 31, 35-36.

YouTube further adjusts its recommendations to advance its priorities as a platform, like promoting novelty and discovery. *Id.* ¶¶ 15, 21, 47. Showing a user "more familiar content similar to what [she] viewed in the past tends to deliver more" short-term value. *Id.* ¶ 15. But YouTube has determined that exposing users to "novel, unfamiliar content could generate greater value in the long term as it allows users to discover more of what they might enjoy on the platform." *Id.* Therefore, "YouTube employees have designed the Recommender System to ensure that the recommendations include novel content and a diversity of content, even when these systems predict that the user would prefer familiar content." *Id.* ¶ 47. In implementing this design choice, "humans at YouTube" make "subjective decision[s]" like whether "physics and math [are] sufficiently different so that they count as diverse" or should be grouped together as "STEM topics." *Id.*

Importantly, YouTube did not just build the Recommender System and leave it to run without further human involvement. *Id.* ¶ 53. Rather, YouTube engineers continually monitor and refine the system "to ensure it is functioning as intended" by "deliver[ing] high-quality recommendations to users consistent with YouTube's own values." *Id.* ¶ 7. That involves ongoing work by hundreds of employees who set metrics for success and evaluate the system against those metrics; test multiple versions of the system to determine which one best furthers YouTube's goals; and adjust the system when it is not producing recommendations consistent with those goals. *Id.* ¶¶ 48, 53-54, 56.

### C. Autoplay on YouTube

To provide a "seamless video-viewing experience akin to consecutive programming of

traditional television, radio, and many other video- and music-streaming services," YouTube provides an autoplay feature. Goodrow ¶ 67. When autoplay is on and a user finishes watching a video, a related video will automatically begin playing shortly thereafter—just like the next show on television or the next episode on Hulu or Disney+ starts playing without the viewer having to pick up the remote and press play. *Id.* ¶ 69. When autoplay is off and a user finishes watching a video, YouTube does not automatically play another video. *Id.* ¶ 70. YouTube may display recommendations to the user, but the user must affirmatively select another video to play. *Id.* To ensure that the videos provided through autoplay are "enriching, trustworthy, [and] age-appropriate," autoplay leverages YouTube's Recommender System to help determine which video to play next. Veitch ¶ 26; Goodrow ¶ 69. Autoplay is also designed to work with videos intended to be viewed sequentially, like music playlists or "Courses," which are series of educational videos that build on one another. Veitch ¶ 26.

### D. YouTube's Parental Controls and Digital Wellbeing Tools for Minors

YouTube recognizes the importance of safeguarding the "privacy, physical safety, mental health, and wellbeing" of minors who use its platform. Veitch ¶ 9. To that end, YouTube has adopted a variety of policies and measures to help ensure that minor users have positive and age-appropriate experiences on the platform.

To start, YouTube's Recommender System is central to "maintain[ing] a responsible and enriching platform for younger users." *Id.* ¶ 21. YouTube has determined that certain content that does not violate its Community Guidelines is nonetheless inappropriate for minors, such as sexually suggestive content or vulgar language. *Id.* ¶ 33. Such content is age-gated and not recommended to users under 18. *Id.* In collaboration with child-development, mental-health, and digital-wellness experts, YouTube has also developed content-moderation standards tailored to minors in different age categories. Goodrow ¶¶ 35-36, 44. For teens aged 13-17, for example, YouTube avoids repeatedly recommending content that, while innocuous as a single video, "could be problematic" if viewed in high quantities—such as content that "displays aggression" or "idealizes some body types ... over others," *id.* ¶ 17. Meanwhile, YouTube elevates for that age group content deemed high quality for teens, such as videos "show[ing] how to build skills and navigate common experiences"

or including "credible, expert-supported conversations about mental health." *Id.* ¶ 36. YouTube has also "worked with outside experts to identify high-quality, age-appropriate content" specifically for children under 13, such as "learning-related content" and "content that encourages children to use their imagination." *Id.* ¶ 29. YouTube prioritizes that content in recommendations for under-13 users but not for older minors. *Id.* ¶ 35. Correspondingly, it deprioritizes content it deems "low quality" for children—like heavily commercial or promotional content—in recommendations for that group. *Id.*

Because YouTube believes that "[p]arents and caregivers play an important role in setting the rules for their family's online experiences," it also offers technological tools and features that empower parents to customize their children's experiences on YouTube. Veitch ¶ 9.

Users under 13 cannot create accounts on their own. *Id.* ¶ 18. Their parents must do so for them, which involves linking the parent's account to the child's. *Id.* Parents have the option of providing their child with access to only YouTube Kids or setting up a Supervised Kid Account. *Id.* YouTube Kids is a standalone app that was built to provide a safer and simpler experience for children under 13 and that "features a carefully curated selection" of age-appropriate content. *Id.* ¶ 19. YouTube Kids also provides built-in tools like adjustable privacy settings and a timer that "display[s] a friendly alert and stop[s] the app" after a set amount of time. *Id.*

A Supervised Kid Account provides access to the standard YouTube platform while still enabling parents to control their children's experience. *Id.* ¶ 20. Parents can choose among age-based content settings, block channels, disable the ability to post, and set screen time limits. *Id.* Parents can also review, pause, and clear their child's watch history, thereby modifying their recommendations. *Id.* ¶¶ 20, 29. YouTube also provides Supervised Teen Accounts for users aged 13-17, which allow parents to view their teen's number of uploads, subscriptions, and comments and receive notifications when their teen uploads a video or starts a livestream. *Id.* ¶¶ 16-17. Supervised teens are automatically placed in a content setting matching their age, which their parents can adjust. *Id.* ¶ 17.

YouTube also offers a variety of "digital wellbeing tools" that "encourage children and teens to be mindful of their screen time." *Id.* ¶¶ 25-29. For all users under 18, YouTube turns off autoplay by default, and parents have the option to disable autoplay entirely for supervised users under 13. *Id.* ¶ 26. YouTube also reminds users to "take a break" after a certain interval, and prompts users to stop

watching YouTube and go to bed at a certain time. *Id.* ¶¶ 27-28. And on YouTube Shorts, a tab on YouTube that displays shorter videos, parents can set a daily time limit as low as 0 minutes. *Id.* ¶ 29.

### E. AB 1709's Restrictions on YouTube's and Its Users' Speech Rights

In September 2026, California enacted AB 1709, which regulates online platforms that offer so-called "addictive feature[s]." Cal. Bus. & Prof. Code § 22682(c). The Act defines "[a]ddictive feature" to include personalized feeds (pejoratively and erroneously described as "addictive feed[s]") and "[a]utoplay." *Id.* § 22682(a). It defines an "[a]ddictive feed" as a "website … in which multiple pieces of media generated or shared by users are … recommended, selected, or prioritized for display to a user based … on information provided by the user, or otherwise associated with the user or the user's device," with narrow exceptions. *Id.* § 22682(b). The Act does not define "autoplay."

Section 22683 is the Act's core operative provision: It bans online platforms from providing personalized feeds or autoplay to users under 16. Section 22683 states that "[a] covered platform shall not provide an addictive feature to a user who is under 16 years of age." *Id.* § 22683(a)(1). And it requires covered platforms to "implement reasonable measures to ensure that users under 16 years of age are not provided any addictive feature on the covered platform." *Id.* § 22683(b). Section 22684, in turn, requires online platforms to "delete the account of a user under 16 years of age" if that user is provided with a personalized feed or autoplay. *Id.* § 22684(b)(1); *see id.* §§ 22683(a)(2), 22684(b)(2). The Act has an effective date of January 1, 2027, and threatens covered platforms with civil penalties of up to $50,000 "per affected minor." *Id.* § 22686(b); *see* Cal. Const. art. IV, § 8(c).

AB 1709 is not California's first attempt to restrict minors' access to personalized feeds. SB 976, enacted in September 2024, bars covered platforms from providing minors with personalized feeds without parental consent and imposes default settings further limiting minors' access to personalized feeds. Cal. Health & Safety Code §§ 27001(a), 27002(b)(2), 27002(b)(4). Under SB 976, users under 16 can access personalized feeds if their parents consent. But if AB 1709 goes into effect, they will lose access to personalized feeds (and autoplay) altogether.

### F. Relevant Procedural History

In November 2025, YouTube brought an as-applied First Amendment challenge to SB 976's restrictions on personalized feeds and sought a preliminary injunction. On August 5, 2026, the district

court denied YouTube's preliminary-injunction motion. It held that YouTube was unlikely to succeed on the merits of its First Amendment claim because YouTube had failed to show "that [its] personalized feeds are 'expressive'" or "reflect human editorial judgment." *Google LLC v. Bonta*, No. 5:25-cv-9795, 2026 WL 2260373, at *5, *9 (N.D. Cal. Aug. 5, 2026). On August 11, YouTube appealed the court's decision and moved for an injunction pending appeal in the district court, which the court denied on August 21. On August 24, YouTube moved for an injunction pending appeal in the Ninth Circuit. The Ninth Circuit motions panel ordered that the motion be referred to the merits panel and that the appeal be placed on the next available oral-argument calendar. *See* Dkt. No. 55.1, *Google LLC v. Bonta*, No. 26-5132 (9th Cir. Sept. 17, 2026). That appeal is ongoing.

## LEGAL STANDARD

YouTube is entitled to a preliminary injunction if it shows that: (1) it "is likely to succeed on the merits"; (2) it "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) "an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

## ARGUMENT

### I. YOUTUBE IS LIKELY TO SUCCEED ON THE MERITS

#### A. Section 230 Preempts AB 1709's Bans on Personalized Feeds and Autoplay.

Section 230 "protect[s] internet-based publishers of third party content from liability." *Doe 1 v. Twitter, Inc.* (*Twitter*), 148 F.4th 635, 640 (9th Cir. 2025). It provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). And it "explicitly preempts inconsistent state laws," *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 681 (9th Cir. 2019), by providing that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with" its terms, 47 U.S.C. § 230(e)(3).

Because AB 1709's ban on personalized feeds and autoplay (and its related account-deletion mandate) runs afoul of that command, YouTube is likely to succeed on the merits of its Section 230 claim. First, there can be no dispute that YouTube provides an "interactive computer service." Second, AB 1709 imposes duties on YouTube in its capacity as a "publisher." And third, AB 1709

imposes those duties as to videos ("information") provided to YouTube by third parties.

*1. YouTube provides an "interactive computer service."*

As the Ninth Circuit and numerous courts in this district have held, YouTube qualifies as an "interactive computer service." 47 U.S.C. § 230(f)(2); *see, e.g.*, *Gonzalez v. Google LLC*, 2 F.4th 871, 891 (9th Cir. 2021), *vacated and remanded on other grounds*, 598 U.S. 617 (2023) (per curiam); *Lewis v. Google LLC*, 461 F. Supp. 3d 938, 954 (N.D. Cal. 2020). YouTube enables multiple "users"—in fact, billions of users each month, Veitch ¶ 39—to "access" content stored on its "computer server[s]," 47 U.S.C. § 230(f)(2). And it does so through "tools" that "pick," "organize," and "display" its users' videos. *Id.* § 230(f)(4).

*2. AB 1709 regulates YouTube as a "publisher."*

A law "treat[s]" a website "as" a "publisher" when it regulates the choices that make up publication—what third-party content is presented, to whom, in what order, and when. *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1104-05 (9th Cir. 2009). A duty directed at those "traditional editorial functions" necessarily depends on the entity's "status or conduct as a 'publisher'" and thus implicates Section 230. *Id.* at 1102 (citation omitted).

That follows from text and precedent. To "treat" X "as" Y is to deal with X in its "capacity" as Y—to hold it to the "duties" of Y. *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 742 (9th Cir. 2024); *see American Heritage Dictionary* 1906 (3d ed. 1992) (to "*treat*," when "used with *as*," means "[t]o regard and handle in a certain way"). A business may operate in several such capacities at once. A newspaper, for instance, is treated as a *corporation* when it is told to pay income tax. *Cf. Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936). Likewise, it is treated as an *employer* when it is told to comply with wage-and-hour laws. *Cf. Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 193-95 (1946). And it is treated as a *publisher* when it is told how it must select, arrange, sequence, or present content. *See Doe 1 v. Meta Platforms, Inc.* (*Doe 1*), 174 F.4th 1159, 1167-69 (9th Cir. 2026); *American Heritage Dictionary* 1464 (to "*publish*" is "[t]o prepare and issue" material); *cf. Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974).

AB 1709 treats YouTube as a publisher. The law seeks to restrict (1) which videos YouTube may show to its users (the personalization ban) and (2) when and how such videos may be shown to

its users (the autoplay ban). Both bans flunk the "simple" "test" for whether a statute violates Section 230, as both "prohibit publishing conduct" on their face. *In re Apple Inc. App Store Simulated Casino-Style Games Litig.* (*In re Apple App Store II*), 806 F. Supp. 3d 1015, 1030 (N.D. Cal. 2025); *see also NetChoice v. Bonta*, 790 F. Supp. 3d 798, 807-10 (N.D. Cal. 2025).

*a. The personalization ban imposes liability when YouTube chooses which third-party videos each user sees.*

AB 1709 prohibits YouTube from personalizing a user's feed—"recommend[ing], select[ing], or prioritiz[ing]" videos—based on any "information provided by the user, or otherwise associated with the user or the user's device." Cal. Bus. & Prof. Code §§ 22682(b), 22683(a)(1). Whether YouTube is liable, then, turns on what content it chooses for its users, and how it chooses that content.

That strikes at the heart of a publisher's job. Ever since Benjamin Franklin "assembled and form'd" the aphorisms in *Poor Richard's Almanack* to appeal to "the common People," Benjamin Franklin, *Benjamin Franklin's Memoirs* 242-44 (Max Farrand ed. 1949), publishers have sought to learn more about their audiences to decide what material to feature and to whom. *See Miami Herald*, 418 U.S. at 258 ("choice of material" requires "editorial control and judgment"). Newspapers print regional editions, book clubs bundle bestsellers with forgotten classics, and music labels compile albums of hits. Whatever the medium, matching the right work to the right reader (or the right listener or the right viewer) is what publishers do. That is as true online as it is offline.

The Ninth Circuit said as much in *Doe 1 v. Meta Platforms, Inc.*, 174 F.4th 1159 (9th Cir. 2026). Plaintiffs there alleged that Facebook was defectively designed because its algorithms promoted some user posts over others, solely in an effort "to drive up engagement." *Id.* at 1164 (no allegation that Facebook "boosted" posts "because of the company's content preferences"). The court held that Section 230 barred the suit, rejecting plaintiffs' effort to characterize their challenge as based on "product design." *Id.* at 1167. The court reasoned that the "alleged defects" went to the "core" of Facebook "as a publishing platform." *Id.* And it concluded that the plaintiffs could not make Facebook liable for "matching users with content" because that is "the work of publishers." *Id.* at 1167, 1169; *accord Force v. Facebook, Inc.*, 934 F.3d 53, 67 (2d Cir. 2019) (websites perform "the functions of publishers" when they "present users with targeted content," even if via "algorithms").

In reaching this conclusion, the court reiterated in plain terms what has long been settled law in this circuit: "algorithms that provide users with suggestions of some third-party posts over others constitute publishing conduct … [u]nder our precedent." *Doe 1,* 174 F.4th at 1168.

The analysis of whether a statute regulates publishing conduct in violation of Section 230 is even more straightforward than the analysis of common law claims. The "test" for statutes is comparatively "simple": On its face, does the law "prohibit publishing conduct"? *In re Apple App Store II*, 806 F. Supp. 3d at 1030.

The answer here is yes: AB 1709 "prohibit[s] publishing conduct" under binding precedent. *In re Apple App Store II*, 806 F. Supp. 3d at 1030. After *Doe 1*, there is no doubt that "matching users with content is publishing conduct." 174 F.4th at 1167. And matching users with content—"recommend[ing], select[ing], or prioritiz[ing]" videos for them, Cal. Bus. & Prof. Code § 22682(b)—is the very thing AB 1709 forbids. Since AB 1709 creates a state-law duty directed at a website's "classic editorial role," Section 230 preempts it. *In re Apple Inc. App Store Simulated Casino-Style Games Litig.* (*In re Apple App Store I*), 625 F. Supp. 3d 971, 995 (N.D. Cal. 2022) (platforms "behaved as 'editors'" under Section 230 when they allegedly used data to make their product "more profitable and more addicting").

*Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021), is not to the contrary. In that case, the Ninth Circuit held that Snapchat's "Speed Filter" (an overlay recording a user's real-life driving speed) was not protected by Section 230. *See id.* at 1088-90, 1093. The court reasoned that the filter was "fully independent of Snap's role in … publishing third-party content" because the feature caused harm (by encouraging dangerous driving) even if no one ever posted. *Id.* at 1093; *see Doe 1*, 174 F.4th at 1168 (conduct at issue in *Lemmon* was "not mediated by third-party content"). Not so with personalized feeds. Their only function is to show videos to users. Since the duty imposed by AB 1709 is not "independent of [YouTube]'s role in … publishing third-party content," *Lemmon*, 995 F.3d at 1093, that duty is preempted by Section 230.

The fact that YouTube uses algorithms to make these choices en masse (and relies on its users' preferences in doing so) is irrelevant. That was true in *Doe 1* too. But "algorithmic content delivery" is still "a form of publisher conduct," the court explained, even if it does not involve "a platform's

own content or messaging," and regardless of whether it is protected by the First Amendment. *Doe 1*, 174 F.4th at 1169; *see also In re Apple App Store I*, 625 F. Supp. 3d at 994 (Section 230 immunizes use of "algorithms to 'amplify and direct users to content'" (citation omitted)).

Similarly irrelevant is the fact that YouTube need not remove any video from its servers in response to AB 1709. *But see NetChoice v. Att'y Gen., Ga.*, No. 25-12436, 2026 WL 3079563, at *9 (11th Cir. Oct. 15, 2026). Just as a newspaper cannot print every article in every edition, YouTube cannot show every video to every viewer. A law telling a magazine that its most recent stories must appear on the front cover of each issue surely interferes with its editorial prerogative, even if every one of its stories remains available in its archives. The decision of how to arrange content remains "quintessentially the province of a publisher." *Twitter*, 148 F.4th at 645-46. Section 230 leaves that decision to YouTube, not the State.

*b. The autoplay ban imposes liability when YouTube publishes third-party videos.*

The autoplay ban likewise prohibits quintessential publishing conduct. On YouTube, autoplay causes another video to begin playing without a separate request from the viewer. Goodrow ¶ 69. AB 1709 thus interferes with YouTube's ability to publish content as it sees fit: under the Act, YouTube must withhold the next video until the user affirmatively asks it to continue.

AB 1709's autoplay ban targets not only a decision related to publication but the very act of publication itself. Publication does not occur just once, when a video is uploaded to YouTube for the first time—instead, a video is published each and every time it is played for a user. *See Barnes*, 570 F.3d at 1104 ("[e]very repetition … is a publication in itself" (citation omitted)). A thumbnail may alert a viewer that a video is available, but it does not communicate the video's images, sounds, and words. Only playing the video can do that. *See Calise*, 103 F.4th at 738-39 (publication occurs when "content" is "communicate[d] … to a third party"). And that is precisely what Section 230 protects—a website's decision "to publish" third-party content to one of its users. *Barnes*, 570 F.3d at 1102 (citation omitted). In this respect, too, AB 1709 attempts to "prohibit publishing conduct" on its face. *In re Apple App Store II*, 806 F. Supp. 3d at 1030.

*Doe 1* once again confirms the point. In that case, as here, Facebook did not wait passively for its users to request new content—it proactively sent videos and posts to its users that they had not

asked for, based on its assessment of what they would like to see. 174 F.4th at 1163-64 (describing Facebook's "notifications" system); *see also Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1097-98 (9th Cir. 2019) (automated "notifications" of recent posts protected by Section 230). That did not change the result. "[E]ven when [a] user has not requested the content," *Doe 1* explained, "matching users with content is publishing conduct." 174 F.4th at 1167. Just so in this case as well because autoplay is a method of "matching users with [a particular piece of] content." *Id.*; *see In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 830-31 & n.16 (N.D. Cal. 2023) (plaintiffs' defective-design claim as to "auto-play" barred by Section 230 because it "directly target[s] defendants' roles as publishers of third-party content" and "would necessarily require defendants to publish less third-party content").

Indeed, even if the ban were to be viewed only as a rule about how to sequence content (as opposed to a rule about whether to publish content at all), it still would fail under Section 230. Since the advent of the written word, publishers have had to decide not only what follows a given work, but whether it should follow immediately, later, or only upon request. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636-37 (1994) (how to sequence others' video programming implicates "editorial discretion"). Must readers wait for the next book or need they only turn the page? Should two stories run side by side or in different issues? Can one song on Spotify fade into the next? In each example, someone must decide whether the next piece of content comes now or later. Autoplay reflects the same type of choice: YouTube leverages its Recommender System to keep showing related videos that are "relevant, trustworthy, and valuable" to the user, with only a short pause in between. Goodrow ¶¶ 6, 69; *see* Veitch ¶ 26 (autoplay facilitates YouTube's choice to play without interruption videos designed to be viewed in sequence, like music playlists and "Courses"). Because making that decision is "what a publisher does," *Barnes*, 570 F.3d at 1102, Section 230 protects that choice.

*c. The account-deletion mandate is predicated solely on publishing activity.*

AB 1709 finally requires YouTube to "delete the account" of any "user under 16 years of age" to whom it provides a personalized feed or autoplay. Cal. Bus. & Prof. Code § 22684(b)(1). Because this mandate is triggered solely by YouTube's "conduct as a 'publisher,'" it is preempted too. *Barnes*, 570 F.3d at 1102; *see Shared Partnership v. Meta Platforms, Inc.*, ___ F.4th ___, 2026 WL 3266791,

at *5 (9th Cir. Oct. 30, 2026) (Section 230 bars liability where platform's decision whether to keep or delete account involves "editorial discretion"). Section 230 precludes California not only from directly banning publishing activities but also from indirectly controlling publishing activities through its account-deletion requirement.

*3. AB 1709 applies to "information provided by" third parties.*

Finally, AB 1709 regulates YouTube as the publisher "of … information provided by another information content provider." 47 U.S.C. § 230(c)(1). By its terms, the ban on personalized feeds applies only to feeds of media "generated or shared by users." Cal. Bus. & Prof. Code § 22682(b). And on YouTube, autoplay likewise presents videos created and uploaded by third-party users. Goodrow ¶¶ 6, 68-69. Because third parties provide the videos YouTube publishes, Section 230's final element is met.

That result is perfectly compatible with YouTube's First Amendment claim, discussed below. The First Amendment applies if the final product is "expressive." *Moody*, 603 U.S. at 731. Section 230, by contrast, applies if the "actions" at issue are those of "a publisher." *Doe 1*, 174 F.4th at 1166. Both can be true, and often will be. Indeed, YouTube's personalized feeds are protected by the First Amendment because they reflect its "editorial judgments," *Moody*, 603 U.S. at 744, and they are protected by Section 230 because they reflect how it chooses to exercise "traditional editorial functions," *Barnes*, 570 F.3d at 1102 (citation omitted). In this sense, the First Amendment and Section 230 work together, not apart. *See Doe (K.B.) v. Backpage.com, LLC*, 768 F. Supp. 3d 1057, 1063 (N.D. Cal. 2025) ("[T]he undisputed core of Section 230 immunity protects a website's moderation decisions, in its role as a 'publisher,' about which third-party content to remove and which to permit. That those moderation decisions are also protected by the First Amendment does not strip them of their Section 230 immunity."); *Patterson v. Meta Platforms, Inc.*, 244 A.D.3d 29, 38 (N.Y. App. Div. 2025) ("[S]ection 230 immunity and First Amendment protection are not mutually exclusive, and in our view the social media defendants are protected by both. Under no circumstances are they protected by neither."). It is for good reason, then, that the Ninth Circuit has rejected any suggestion that *Moody* narrowed Section 230's scope. *See Doe 1*, 174 F.4th at 1168-69. YouTube can

(and should) prevail on both of its claims.[1]

**B. AB 1709's Ban on Personalized Feeds Violates the First Amendment.[2]**

Because Section 230 expressly preempts AB 1709, this Court need not reach YouTube's constitutional claim. But even if Section 230 did not bar the State's sweeping ban on personalized feeds, the First Amendment would. Where a "plaintiff alleges a First Amendment violation," it need only make "a colorable claim that its First Amendment rights have been infringed" before "the burden shifts to the government to justify the restriction on speech." *Bonta*, 2026 WL 2260373, at *4 (quoting *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022)). YouTube has raised a more than colorable claim that its personalized feeds are expressive compilations protected by the First Amendment. And under any level of heightened scrutiny, the State cannot justify its content-based prohibition on YouTube's ability to provide under-16 users access to that expression.

*1. AB 1709's ban on personalized feeds burdens YouTube's and its minor users' First Amendment rights.*

---

[1] The same result follows even if personalized feeds are merely "'passive receptacle[s]' of third-party speech," as the district court preliminarily held in the SB 976 litigation. *Bonta*, 2026 WL 2260373, at *5 (citation omitted); *see In re Apple App Store I*, 625 F. Supp. 3d at 980 ("In enacting Section 230, Congress chose to immunize service providers to avoid any restriction of interactive computer service providers' passive hosting of third-party speech."). If YouTube's personalized feeds do not represent its "own expressive activity or content (i.e., first-party speech)," then they necessarily consist of "someone else's expressive activity or content (i.e., third-party speech)." *Anderson v. TikTok, Inc.*, 116 F.4th 180, 183 (3d Cir. 2024). And publishing third-party speech is what Section 230 protects. *See Barnes*, 570 F.3d at 1100-02.

[2] YouTube recognizes that its First Amendment challenge to AB 1709's personalized feeds ban is inconsistent with the court's determination in *Google LLC v. Bonta*, No. 5:25-cv-9795, 2026 WL 2260373 (N.D. Cal. Aug. 5, 2026), that YouTube's personalized feeds are not entitled to First Amendment protection because they do not "reflect human editorial judgment." *Id.* at *9. As noted above, YouTube has appealed that decision.

a. The First Amendment protects YouTube's personalized feeds because they are the product of YouTube's editorial judgments about how to curate third-party content in a manner that best serves users' interests while advancing YouTube's values. That conclusion follows directly from the Supreme Court's decision in *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024).

In *Moody*, the Supreme Court held that curated online feeds are expressive, reaffirming that an entity "'exercis[ing] editorial discretion in the selection and presentation' of content is 'engage[d] in speech activity.'" *Id.* at 731 (citation omitted). YouTube has exercised its editorial judgment to "select" and "present" content to users based on what they are likely to find "relevant, trustworthy, and valuable" and will "optimize[] for [their] long-term user satisfaction." Goodrow ¶¶ 6, 13. The First Amendment protects that expressive choice about how to "order[] and organize[]" third-party content and the "distinctive compilations of expression"—personalized feeds—that result from it. *Moody*, 603 U.S. at 716, 740. By barring YouTube from displaying personalized feeds to users under 16, California restricts YouTube's ability to "compil[e] the third-party speech it wants in the way it wants," and to "offer[] the expressive product that most reflects its own views and priorities." *Id.* at 718. *Moody* makes clear that such a law must survive First Amendment scrutiny. *Id.* at 731-32.

That is true even if YouTube relies on an algorithm to help implement its editorial objectives as to individual users. *Moody* held that the First Amendment protects YouTube's feeds while recognizing that personalization implemented using algorithms is a defining characteristic of those feeds: The Court explained that YouTube's curation of "the billions of posts or videos … that could wind up on a user's customized feed or recommendations list" is "achieved through the use of algorithms" and is "most often based on a user's expressed interests and past activities." *Id.* at 734-35.

In recognizing that the First Amendment protects YouTube's personalized feeds, *Moody* followed bedrock free-speech principles. Determining what speech to include in a compilation based on what will "generate[] … interest" with one's audience is a classic "exercise of journalistic discretion" protected by the First Amendment. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 682-83 (1998). Through its Recommender System, YouTube "promotes [its] own message to users" that they are likely to find the content presented to them interesting, relevant, and valuable.

*NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1014 (9th Cir. 2025). That is "not unlike" the choice made by curators of "traditional media" to tailor their compilations to readers' or viewers' interests. *Id.*; *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 716 (4th Cir. 1991) (en banc) ("[I]t is hardly unusual for publications to print matter that will please their subscribers."). To be sure, personalization algorithms allow for a degree of individual tailoring never before possible. But "'whatever the challenges of applying the Constitution to ever-advancing technology, the basic principles' of the First Amendment 'do not vary.'" *Moody*, 603 U.S. at 733 (citation omitted).

The Supreme Court's decision in *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011), confirms that a "restriction[]" on the "use of" individualized "information" to tailor one's message to a particular recipient constitutes a "burden on protected expression." *Id.* at 571. There, Vermont sought to bar pharmaceutical companies from using information about doctors to "'tailor[]' their 'presentations to individual prescriber[s].'" *Id.* at 561 (citation omitted); *see id.* at 578-79. The Court held that Vermont's law violated the First Amendment, explaining that "[a]n individual's right to speak is implicated when information he or she possesses is subjected to 'restraints on the way in which the information might be used.'" *Id.* at 568 (citations omitted). AB 1709 suffers from the same defect: It restricts YouTube's ability to use individualized information to "'tailor[]' [its] 'presentations'" to each user. *Id.* at 561 (citation omitted).

The Ninth Circuit has also observed that "the more an algorithm implements human editorial directions, the more likely it is to be expressive." *NetChoice*, 152 F.4th at 1014. YouTube's algorithm implements human editorial judgments at every stage of the recommendation process. Humans at YouTube decide "what editorial goals should be built into the … [s]ystem," select and design "signals [to] be used as inputs," establish principles for how to "translate those signals into recommendations," set "metrics" to "measure[] … success," and continually "monitor," "test," and "refine" the algorithm to ensure outputs reflect YouTube's goals and values. Goodrow ¶¶ 39, 41, 45, 48, 53, 56.

For example, YouTube strives to promote long-term satisfaction over short-term engagement. *Id.* ¶ 13. And YouTube has determined that values like "discovery and novelty" advance that goal. *Id.* ¶ 47. Therefore, YouTube has designed its algorithm to recommend content to users that is different from what they have viewed before so they can discover new videos and "new areas of

interest [they] did not even know [they] had." *Id.* ¶ 15. That requires YouTube employees to make "subjective decision[s]" such as whether topics like "physics and math [are] sufficiently different so that they count as diverse," to "handpick training examples" that teach the algorithm what qualifies as "diverse," and to monitor the system to ensure it is correctly balancing new versus familiar content. *Id.* ¶¶ 44, 47, 55. In that way, YouTube's algorithm acts as a tool for "implement[ing] human beings' inherently expressive choice[]" to promote novelty and diversity. *Moody*, 603 U.S. at 746 (Barrett, J., concurring). Of course, YouTube cannot determine what will be novel and diverse to a user without considering what she has viewed before—precisely what AB 1709 prohibits.

To be sure, in footnote 5 of *Moody* the Supreme Court stated that it was not addressing algorithms that "respond *solely* to how users act online," merely "giving them the content they appear to want." 603 U.S. at 736 n.5 (emphasis added). And the Ninth Circuit previously suggested that such an algorithm "probably is not expressive." *NetChoice*, 152 F.4th at 1014. That tentative suggestion overlooks that such an algorithm would still implement a protected editorial judgment to give users "content they appear to want." But this Court need not decide that issue: YouTube's algorithm incorporates not only information about "how users act online" but also YouTube's value-laden judgments about what kind of content is valuable and appropriate for each user. For example, as explained above, YouTube has designed its algorithm based on its judgment that novelty and discovery foster positive long-term experiences, so its algorithm will "take[] a chance" by recommending content that users may not appear to want based solely on their past behavior but that they may find enjoyable. Goodrow ¶ 47. Likewise, YouTube has trained its algorithm to avoid repeatedly recommending videos "compar[ing] physical features" to a teen even if that is what the teen most appears to want. *Id.* ¶ 17. Therefore, YouTube's algorithm does not resemble the hypothetical algorithm on which *Moody* reserved judgment—as the Court itself recognized in distinguishing that hypothetical from "YouTube's main feed[]." 603 U.S. at 736 n.5.

In denying YouTube's motion for a preliminary injunction against enforcement of SB 976, the district court concluded that YouTube's personalized feeds are not expressive because YouTube uses an algorithm to implement its decision to show each user content she is likely to find interesting, relevant, and valuable. The court adopted the State's theory that when YouTube decides to "convey

to users _____" because it is interesting, relevant, and valuable, only the granular decision to "fill[] in the blank" with, for example, a cat video is expressive. *Bonta*, 2026 WL 2260373, at *5. But that theory contradicts *Moody*, which held that YouTube's feeds are protected even though YouTube relies on algorithms to identify content that violates its Community Guidelines "without a person in the loop." 603 U.S. at 745-46 (Barrett, J., concurring); *see id.* at 743-45.

The court posited that content moderation is different because humans at YouTube decide "we don't want _____ on our platforms" and also fill in the blank with, for example, nudity. *Bonta*, 2026 WL 2260373, at *7. But there is no principled reason why that distinction should be dispositive: The decision to show users personally interesting, valuable, and age-appropriate content and the decision not to show users nudity are both first-order editorial judgments implemented using algorithms. *See* Expert Declaration of Georgios Zervas ¶¶ 33, 42(d)-(e). Moreover, while some of YouTube's Guidelines prohibit discrete topics or types of content (like nudity), others identify disfavored content based on more abstract qualities, like "deceptive" content. *Moody*, 603 U.S. at 735. Under the State's theory, feeds reflecting YouTube's policy against deceptive content would not be protected because humans at YouTube decide "users should not be shown _____ because it is deceptive," but they do not "fill in the blank" with, for example, pyramid-scheme videos. But that would contravene *Moody*'s holding that the First Amendment protects YouTube's use of algorithms to implement its Community Guidelines, including its policy against "deceptive" content. Thus, under *Moody*, because YouTube's personalized feeds reflect YouTube's editorial judgment to convey personally interesting content, they are protected even though humans do not handpick topics for each individual user's feed.

b. AB 1709 also restricts YouTube's under-16 users' First Amendment "right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). By barring those minor users from accessing compilations of videos best suited to their age, interests, and developmental needs, AB 1709 inflicts a substantial First Amendment harm. YouTube is "full of valuable and enriching content for minors," from "step-by-step instructions on how to solve calculus problems" to "clips of the latest Broadway plays." Veitch ¶ 11. But without personalization, much of that content could be buried beneath an endless stream of content that is intended for users of different ages or with different

interests. After all, more than 20 million videos are uploaded to YouTube *each day*. Goodrow ¶ 6.

That under-16 users can still manually search for content on YouTube is no answer. AB 1709 prohibits those minors from accessing YouTube's "larger offering": its curated compilations of third-party speech. *Moody*, 603 U.S. at 738. More fundamentally, personalization on YouTube is designed to help users discover content that interests them, which they "may not have known to specifically search for." Goodrow ¶¶ 6, 65. Therefore, forcing under-16 users to rely on search to filter through the mountainous amounts of content on YouTube still meaningfully *burdens* their speech rights. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000) ("distinction between laws burdening and laws banning speech is but a matter of degree").

*2. AB 1709's ban on personalized feeds is content-based and must therefore satisfy strict scrutiny.*

Because YouTube has made "a colorable claim" that AB 1709 infringes its and its users' First Amendment rights, "the burden shifts to the government to justify the restriction on speech." *Bonta*, 2026 WL 2260373, at *4 (citations omitted). California cannot do so because AB 1709's ban on personalized feeds is a content-based restriction that fails any level of heightened scrutiny.

AB 1709's ban on personalized feeds is content-based because it restricts speech with a particular kind of "communicative content," *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015): speech that is likely to be interesting, relevant, and valuable to an individual user. The Supreme Court has established that a law is content-based if it regulates speech based on an underlying quality related to its communicative effect on the listener. *See Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 532, 537-38 (1980) (holding that a bar on "controversial" speech is content-based); *Matal v. Tam*, 582 U.S. 218, 231, 243 (2017) (similar for "disparag[ing]" speech). AB 1709's ban on speech that is individually "interesting" is no less content-based than a prohibition on "controversial" or "disparaging" speech.

That YouTube must change its speech to comply with AB 1709 confirms that it is content-based. A law is content-based where speakers can "'avoid or mitigate' the effects of the [law] by altering their speech." *TikTok Inc. v. Garland*, 604 U.S. 56, 71 (2025) (citation omitted). To "'avoid or mitigate' the effects" of AB 1709, YouTube must change the expressive compilation of videos in

its feeds, thereby "altering [its] speech." *Id.* A law prohibiting librarians from recommending books based on a patron's reading history and interests would plainly be content-based because librarians would have to change their recommendations—the same principle applies here.

3. *AB 1709's ban on personalized feeds fails any form of heightened scrutiny.*

Because AB 1709 is content-based, it is "presumptively invalid," *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382 (1992), and can be justified only if it is "narrowly tailored to serve compelling state interests," *Reed*, 576 U.S. at 163. And even content-neutral speech restrictions must advance "governmental interests unrelated to the suppression of free speech" and must "not burden substantially more speech than necessary." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997). AB 1709's outright ban on personalized feeds fails either form of heightened scrutiny.

Far from advancing an interest "unrelated to the suppression of free speech," *id.*, AB 1709's core objective is to suppress protected speech that California regards as "addictive" for minors. AB 1709's legislative findings make clear that the State seeks to reduce the amount of time minors spend accessing speech on social-media platforms by forcing platforms to organize or display that speech in a less interesting way. AB 1709 § 1. The law's objective is thus *directly* "[]related to the suppression of free speech"—just like a law requiring libraries to mix books up on shelves so minors cannot find ones that interest them and spend less time reading.

Even assuming the State had a valid interest, AB 1709 is not sufficiently tailored to that interest. A complete ban is the antithesis of narrow tailoring. In defending SB 976 as narrowly tailored, the State emphasized that it "does not prevent parents from allowing their children to access personalized feeds" and that "allow[ing] for parental opt-ins … reflects the State's effort to limit SB 976 so it does not go beyond what is necessary to effectuate its purpose"—the very same purpose the State claims to be pursuing here. Dkt. No. 47 at 45-46.[3] So the State has effectively conceded that AB 1709's ban on access to personalized feeds even with parental consent "go[es] beyond what is necessary" to achieve its goals. *Id.* In denying YouTube's motion to enjoin SB 976 pending appeal,

---

[3] Unless otherwise indicated, "Dkt. No." refers to the docket entries in *Google LLC v. Bonta*, No. 5:25-cv-9795 (N.D. Cal.).

the district court reasoned that SB 976 "is not sweeping" because it does not "deprive parents of decision-making authority in determining what is best for the[ir] children when it comes to engaging with social media." Dkt. No. 115 at 2. That is precisely what AB 1709 does while ignoring obvious less restrictive alternatives, like voluntary parental controls at the platform or device level, which advance the State's objective without forcing YouTube to alter its speech or stripping parents of decision-making authority. The State has made no effort to show that those alternatives are ineffectual before resorting to the most restrictive option of a ban. *See McCullen v. Coakley*, 573 U.S. 464, 495 (2014) (The State must "demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier."). Indeed, the State has elsewhere affirmatively endorsed the less restrictive alternative of providing minor users with an option for non-personalized feeds. *See* Dkt. No. 61.2 at 1-2, *Google LLC v. Bonta*, No. 26-5132 (9th Cir. Oct. 6, 2026). The State cannot claim that nothing short of a ban will do while simultaneously touting a voluntary setting as a "landmark" in protecting "the mental and physical health of children," *id.*—the same interest it claims to be pursuing here.

The Supreme Court has held that "[a] complete ban can be narrowly tailored … only if each activity within the proscription's scope is an appropriately targeted evil." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). AB 1709 cannot satisfy that test because it is "vastly overinclusive." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 804 (2011). It prohibits all personalized content, even though recommending videos about mechanical engineering to a teen interested in robotics is in no way an "appropriately targeted evil." *Frisby*, 487 U.S. at 485. The law also bans access to personalized recommendations for *all* under-16 users—even though the State's experts have admitted that only a small number suffer from purported "[s]ocial media addiction." Dkt. No. 47-5 ¶ 50. The law therefore bans access to YouTube's expressive product across the board "because of the threat of addiction in any subset of users, no matter how small." *NetChoice v. Griffin*, 812 F. Supp. 3d 905, 926 (W.D. Ark. 2025). At the same time, AB 1709 is fatally underinclusive because it "single[s] out" certain platforms (like YouTube) while leaving untouched other platforms that deliver videos through personalized feeds (like Netflix and Hulu) without providing a "persuasive reason why." *Brown*, 564 U.S. at 802.

Further, under strict scrutiny, the State must "show a direct causal link" between personalized

feeds and "harm to minors." *Brown*, 564 U.S. at 799. And intermediate scrutiny requires the State to "demonstrate that the recited harms are real … and that the regulation will in fact alleviate [those] harms in a direct and material way." *Doe v. Harris*, 772 F.3d 563, 577 (9th Cir. 2014) (citation omitted). The State fails either standard because it cannot show any link between personalization and harm to minors. Neither AB 1709's legislative findings nor the 500 pages of expert materials the State produced in defending SB 976 contain any reliable evidence establishing that personalized feeds harm minors. *See* Expert Declaration of Jeffrey A. Hall (Hall) ¶¶ 22, 34; Expert Declaration of Jennifer Pfeifer (Pfeifer) ¶¶ 55-67; *see also* Expert Declaration of Douglas E. Tucker ¶¶ 38-39. That is unsurprising: After conducting their own review of the literature, Dr. Hall and Dr. Pfeifer—leading experts in the field—found no peer-reviewed or published studies showing that personalization causes or is correlated with negative health outcomes in minors. Hall ¶¶ 22, 27, 29; Pfeifer ¶¶ 54, 67, 76-77. Indeed, the only study the State cited in the SB 976 litigation that specifically considered YouTube's personalized feeds found *no link* between personalization on YouTube and harm to minors. Hall ¶ 36. AB 1709's legislative findings refer vaguely to evidence relating to social media generally. AB 1709 § 1(g), (j). But AB 1709 bans personalization, not access to social media. So the State must establish that personalization in particular harms minors. Hall ¶¶ 24-25. It cannot do so.

## II. THE EQUITABLE FACTORS CUT DECISIVELY IN FAVOR OF A PI

a. Absent an injunction, YouTube and its minor users will suffer irreparable harm to their First Amendment rights. Compelling YouTube "to alter [its] editorial policies and posting practices to comply with [a] new speech law … while its constitutionality under the First Amendment is being litigated" inflicts "irreparable harm." *Labrador v. Poe*, 144 S. Ct. 921, 929 (2024) (Kavanaugh, J., concurring). The law also harms the First Amendment interests of the larger YouTube community, including content creators who will struggle to reach their intended audiences and, most relevant here, minors who will lose access to personalized and seamless compilations of content. Under-16 users will instead be forced to navigate an ocean of content on subjects of no interest to them or intended for audiences of different ages. "[A] colorable First Amendment claim" is all that is needed to "raise[] the specter of irreparable injury." *NetChoice*, 152 F.4th at 1024 (citation omitted). YouTube has at a minimum cleared that low threshold and thus shown "irreparable injury sufficient to merit the grant

of relief." *Harris*, 772 F.3d at 583 (citation omitted).

Aside from the constitutional harms, YouTube will also face substantial and unrecoverable compliance costs without an injunction. Personalized feeds and autoplay are central building blocks of the platform. To comply with AB 1709, YouTube would need to overhaul its engineering infrastructure and operations, "invest[ing] significant resources to develop new systems." Veitch ¶¶ 55-57; *Grand River Enters. Six Nations, Ltd. v. Knudsen*, No. 23-35494, 2024 WL 2992503, at *2 (9th Cir. June 14, 2024) (monetary injury is "irreparable when the plaintiff cannot sue the defendant to recover money damages" because the defendant is a State). Moreover, AB 1709 will "fundamentally reorient [YouTube's] relationship with [its] users." *Bonta*, 761 F. Supp. 3d at 1236. Being forced to use YouTube without personalization or autoplay "will negatively affect users' experiences" and may lead them to abandon the platform, placing YouTube "at a competitive disadvantage … relative to competitors like Hulu, Disney+, and Spotify." Veitch ¶¶ 51, 57-58. That "threatened loss of … customers or goodwill" constitutes "irreparable harm." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001).

b. "[I]t is clear that it would not be equitable or in the public's interest to allow the state … to violate the requirements of federal law." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (citation omitted). And in this case, the equities are even more clear-cut. "[T]here is a strong interest in maintaining a free flow of speech." *Bonta*, 761 F. Supp. 3d at 1236; *see also NetChoice*, 790 F. Supp. 3d at 811. YouTube is a centerpiece of the "modern public square," serving as the preeminent online platform for sharing and discovering video content for billions of users. *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). The State seeks to fundamentally alter the speech environment on YouTube and force YouTube to change its publishing decisions without any evidence that doing so will have a positive impact. The equities and the public interest therefore favor putting enforcement of AB 1709 on hold while the courts decide whether the law complies with the First Amendment and Section 230.

**CONCLUSION**

The Court should grant YouTube's motion for a preliminary injunction.

Dated: November 5, 2026

COOLEY LLP

By: */s/ Elizabeth B. Prelogar*
Elizabeth B. Prelogar

Attorney for Plaintiffs Google LLC and YouTube, LLC